KEVIN O'BRIEN *vs.* JOHN H. PEARSON, JR., & others.[1]

Middlesex. February 8, 2007. - June 19, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Corporation,* Close corporation, Sale of assets, Stockholder. *Fiduciary. Damages,* Breach of fiduciary duty.

In a civil action alleging breach of fiduciary duty on the part of the defendant majority shareholders in a close corporation, the evidence was sufficient to warrant denial of the defendants' motions for directed verdict and judgment notwithstanding the verdict [383-384]; further, the judge did not abuse his discretion in denying the defendants' motion for a new trial, where the jury could interpret the defendants' decision to shift away from the animating purpose of the close corporation to a much narrower, if legitimate, purpose, without dialogue with the plaintiff (a minority shareholder), as a breach of the defendants' fiduciary duty to the plaintiff [384-386]; however, the judge abused his discretion in concluding that the jury's award of damages reflected honest and reasonable judgment in accordance with controlling principles of law, where the plaintiff did not show with reasonable certainty that he suffered compensable damages as a result of the defendants' breach [387-391].

CIVIL ACTION commenced in the Superior Court Department on February 2, 1999.

The case was tried before *Raymond J. Brassard,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Edward Notis-McConarty (Joseph L. Bierwirth, Jr.,* with him) for the plaintiff.

*Jeffrey S. King (William G. Potter* with him) for the defendants.

SPINA, J. The plaintiff, Kevin O'Brien, brought this claim against John Pearson and Margaret Palm[2] (defendants), his fel-

---

[1]Margaret A. Palm; Summerhill Estates, Inc.; and Premier Homes, Inc.

[2]The parties have stipulated that Margaret Palm and her husband Nels Palm are interchangeable for the purposes of this litigation. Although Margaret Palm was named a director of Summerhill Estates, Inc. (Summerhill), it was

low shareholders in the closely held corporation Summerhill Estates, Inc., for breach of fiduciary duty. The jury concluded by special question that O'Brien was a forty-eight per cent shareholder in the corporation, and awarded him $900,000 on his breach claim. A Superior Court judge denied the defendants' motions for a directed verdict and judgment notwithstanding the verdict or, in the alternative, for a new trial. The Appeals Court reversed the judgment, *O'Brien* v. *Pearson*, 67 Mass. App. Ct. 29 (2006), and we granted O'Brien's application for further appellate review. We affirm in part and reverse in part and remand for a new trial solely on the issue of damages.

1. *Background.* Kevin O'Brien is a home builder and developer who learned of a subdivision project in 1991 on a certain parcel of land in Dracut (subdivision). O'Brien knew the defendant John Pearson to be the president of Butler Bank, which he previously used to finance construction projects. After performing preliminary research, O'Brien approached Pearson in 1996 with the intention of obtaining financing to purchase and build on the Dracut subdivision.[3] Pearson and O'Brien reached a "gentlemen's agreement" to work on the development together and share the profits "fifty-fifty." Pearson asked O'Brien to work with his business partner, Nels Palm, on cost estimates for the project.

The subdivision was owned at that time by Twin Hills Development Corporation (Twin Hills), whose principals were Dominic and Vincent Shelzi. By the time O'Brien became aware of the subdivision in 1991, the Shelzis were experiencing financial difficulties and Twin Hills had filed for bankruptcy protection. Development of the project was in limbo, despite previous approval of the subdivision plan by the town. In 1989 Twin Hills gave a note for $700,000 to Wakefield Savings Bank, which was secured by a mortgage on nine strategically positioned lots of the subdivision and personal guarantees by the Shelzis. By 1998 the note was in default, having accrued an obligation of over $1 million. However, Twin Hills's debt

her husband who participated primarily in the events of this case. Unless otherwise noted, "Palm" refers hereafter to Nels Palm.

[3] The testimony of the parties is somewhat contradictory as to which party originated the idea of a collaboration to develop the subdivision.

had been restructured by the United States Bankruptcy Court for the District of Massachusetts subject to a plan that allowed the note and mortgage to be satisfied with a payment of $432,000, to be repaid through the phased sale of lots in the subdivision.

O'Brien, Pearson, and Palm developed a business strategy to buy the note and mortgage to use as leverage in the land acquisition process. They reached an agreement with Wakefield Savings Bank to purchase the note and mortgage for $100,000. The capital to complete this purchase was put forth by Nels Palm, who was assigned the note and mortgage individually on March 16, 1998.

That same day, Pearson sent O'Brien a letter agreement on behalf of himself and "the Palms" drafted on the letterhead of American Stonehenge, Inc., a corporation whose principals were Pearson and Palm. The letter presupposed ownership of the subdivision and laid out the respective responsibilities of the parties — with O'Brien to act as builder and Pearson and Palm as financiers. It discussed the division of fees and profits, selection of vendors, various bonuses and advances for building the houses, right to counsel for the parties and, most significantly, the creation of a corporation named Summerhill Estates, Inc. (Summerhill). The letter proposed that Summerhill would have three shareholders: John Pearson and Margaret Palm each as twenty-six per cent shareholders, and Kevin O'Brien as a forty-eight per cent shareholder. The document specifically stated that Pearson and Nels Palm would "obtain and continue the financing (as long as the project is economically feasible) and contribute or loan funds for the development of the property or properties and manage the business and financial affairs of the development." O'Brien signed and returned the agreement to Pearson.

On March 19, 1998, the articles of organization for Summerhill were filed, listing John Pearson, Margaret Palm, and Kevin O'Brien as directors, without detailing the shareholder distribution. Palm assigned to the new corporation the note and mortgage that he acquired from Wakefield Savings Bank. According to O'Brien, the Summerhill principals also discussed the need to compensate the Shelzis above and beyond the release of the mortgage and note in order to obtain ownership of the

entire subdivision. As the corporation moved forward with its business plan to acquire and develop the Dracut subdivision, O'Brien was asked by Pearson and Palm not to participate in negotiations with the Shelzis. Instead, Joel Kahn, a hired consultant who assisted in the note and mortgage acquisition, was instructed by the defendants to engage the Shelzis on the sale of the Dracut subdivision.

Kahn, who took his instructions from Pearson and Palm, negotiated with the Shelzis over the next four months. His approach was one of a lender discussing a debt with a borrower and he issued default letters to the Shelzis through counsel. Kahn believed this strategic decision was necessary to avoid lender liability that could open the door to Twin Hills escaping its obligation under the note and mortgage. On May 6, 1998, Kahn wrote a letter to Pearson and Palm reporting on his progress with the Shelzis. He informed them that the Shelzis had a prospective third-party buyer. He also reported that the Shelzis inquired of him whether Summerhill would be interested in purchasing the subdivision. Kahn's response "was to leave them with the impression that while this was not our primary objective, we would consider taking title to the property as a last resort." Additionally, Kahn reported that the Shelzis responded that "$250,000 would be an approximate amount that they feel would represent fair compensation to them" in addition to an agreement to allow their father to continue to occupy a house already existing in the subdivision.

Throughout these negotiations, Kahn's first priority was satisfaction of the note and not acquisition of the whole subdivision. He was unwilling to meet the Shelzis' demand for an additional payment on top of the release of the note in order to obtain outright ownership of the entire subdivision. Instead, the deal contemplated by Kahn included Summerhill's receiving the whole subdivision in exchange for only the release of the note, an allowance for the Shelzis' father to remain in his house, and the Shelzis retaining one or two lots in the subdivision. In his May 6, 1998, report, Kahn openly allowed for the possibility that the Shelzis could secure another buyer for the property and satisfy their debt through the proceeds of such a sale, suggesting that Summerhill's next step should be to "[s]tructure a

deed in lieu [of foreclosure] that would automatically occur should [the Shelzis] be unable to sell to a third party by no later than September 1, 1998." O'Brien made his displeasure with Kahn's course of action well known. Immediately after seeing the May 6, 1998, report from Kahn, O'Brien telephoned Pearson and questioned the course of the negotiations, but was told that "everything is going to work out."

On May 18, 1998, Premier Homes, Inc. (Premier), entered into an agreement with the Shelzis to buy the subdivision. Despite O'Brien's singular focus on obtaining the entire subdivision, Kahn continued to pursue a course of negotiation that allowed for Summerhill's acquisition of the subdivision only in the event that the Shelzis could not close their deal with Premier. Kahn negotiated an August, 1998, letter of agreement with the Shelzis, along the lines first discussed in his May 6 report, to the effect that Summerhill would accept either a discounted $400,000 payment to satisfy the note and mortgage, or take a quitclaim deed in lieu of foreclosure if the deal with Premier was unable to be completed by a certain date.[4] In Kahn's view, the letter of agreement protected Pearson and Palm because the two possible outcomes were either a $400,000 payment on an initial $100,000 investment or a deed for the entire subdivision in lieu of foreclosure. On the other hand, Kahn also thought this was the best deal possible for Summerhill. Although the amount owing on the note had swollen in excess of $1 million, secured by both the mortgage and the personal guarantees of the Shelzis, Kahn believed that the Shelzis would follow through on threats to declare personal bankruptcy if Summerhill pressed too hard on their individual liability. Kahn also believed that, although the Twin Hills bankruptcy plan required discharge of the mortgage on payment of $432,000, it was in Summerhill's best interest to accept the discounted $400,000 amount. The August letter agreement was formalized into a settlement document dated December 8, 1998, and signed by Pearson on behalf of Summerhill.[5]

O'Brien sent Nels Palm a letter on September 9 expressing

---

[4]The letter of agreement is not in the record and there was no testimony concerning the particular date on which this contingency would be triggered.

[5]Although the settlement agreement is dated December 8, 1998, it states:

his disapproval. O'Brien also met with Palm and Pearson on September 17 and 18 to object to the course of action. On September 21, O'Brien wrote again to Palm, offering to purchase the note and mortgage from Summerhill himself for $400,000, with a contingency for further "local approvals to proceed." O'Brien's offer also included a credit to himself for one-half of the profits from the sale of the note and mortgage, as per the initial March 16, 1998, agreement. Nels Palm rejected the offer by letter on September 23, stating that Summerhill would accept an offer that included a $400,000 cash payment within thirty days and a good faith deposit of $25,000. The parties continued to exchange correspondence throughout the fall, but no sale agreement of the note and mortgage to O'Brien individually was reached.

Sale of the subdivision to Premier was completed on January 22, 1999, thereby nullifying the contingency in Summerhill's settlement agreement. Twin Hills received a sum of $640,000 in the transaction, of which $400,000 was earmarked to release the note and discharge the mortgage held by Summerhill, and $150,000 was used to pay back taxes. Five days later, Pearson called a special meeting of the board of directors of Summerhill, which O'Brien attended with counsel. Pearson's purpose, as reflected in draft minutes he prepared prior to the meeting, was to gain corporate approval of Summerhill's discharge of the mortgage under the terms of the settlement agreement. The draft minutes indicated that a unanimous vote of the directors and stockholders approved of such a disposition, but O'Brien objected to such a vote occurring at the meeting. The meeting concluded without a formal vote, and the mortgage and note were discharged shortly thereafter.

The net proceeds of the discharge of the mortgage, after Palm's investment capital was repaid and Kahn's expenses were accounted for, totaled approximately $245,000. Pearson contacted

"Summerhill agrees not to record the aforesaid quitclaim deed any sooner than November 16, 1998, subject to the Obligor's performance of the terms hereof." A different section of the agreement created terms in which Summerhill would extend the date of performance. We assume, without enlightenment from the parties, that such terms were fulfilled and the defendants extended the time frame in which the Shelzis were to pay for the discharge of the note and mortgage.

O'Brien to arrange a meeting to discuss the status of these proceeds. O'Brien did not respond and instead initiated this litigation.

2. *Breach of fiduciary duty.* The denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict both present questions of law reviewed under the same standard used by the trial judge. *D'Annolfo* v. *Stoneham Hous. Auth.*, 375 Mass. 650, 657 (1978). J.W. Smith & H.B. Zobel, Rules Practice § 50.12, at 208 (1977 & Supp. 2007). Review of these motions requires us to construe the evidence in the light most favorable to the nonmoving party and disregard that favorable to the moving party. *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 326 (1982). In other words, "the standard to be employed is whether 'the evidence, construed against the moving party, justif[ies] a verdict against him.' " *Bonin* v. *Chestnut Hill Towers Realty Corp.*, 392 Mass. 58, 59 (1984), quoting *D'Annolfo* v. *Stoneham Hous. Auth.*, *supra*. Our duty in this regard is to evaluate whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be made in favor of the [nonmovant]." *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 413 Mass. 119, 121 (1992), quoting *Dobos* v. *Driscoll*, 404 Mass. 634, 656, cert. denied sub nom. *Kehoe* v. *Driscoll*, 493 U.S. 850 (1989).

We agree with the trial judge that the evidence presented to the jury is sufficient to warrant denial of the defendants' motions for directed verdict and judgment notwithstanding the verdict. As shareholders in a close corporation, the parties owed each other a fiduciary duty of the "utmost good faith and loyalty."[6] *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 593 (1975), quoting *Cardullo* v. *Landau*, 329 Mass. 5, 8 (1952). O'Brien's version of the events, including his understanding of the March 16, 1998, letter agreement and the accompanying discussions leading up to formation of

---

[6]A close corporation has the following characteristics: "(1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation." *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 586 (1975).

Summerhill, as well as his interpretation of the negotiations of May through September, 1998, provide more than the minimal necessary factual support for a reasonable inference that the defendants committed a breach of this duty. Viewed through the lens of the directed verdict standard, there can be little doubt that evidence exists to support such a conclusion.

The defendants' motion for a new trial presents a more difficult question. The standard to be used by a trial judge in this regard is more favorable to the moving party because "the judge must necessarily consider the probative force of the evidence," rather than performing only the quantitative analysis called for in a motion for a directed verdict. *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 60 (1948). The judge should only set aside a verdict as against the weight of the evidence when it is determined that the jury "failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law." *Robertson* v. *Gaston Snow & Ely Bartlett*, 404 Mass. 515, 520, cert. denied, 493 U.S. 894 (1989), quoting *Hartmann* v. *Boston Herald-Traveler Corp.*, *supra* at 60. Such a decision rests in the sound discretion of the judge and we disturb this ruling only if there has been an abuse of that discretion. *Robertson* v. *Gaston Snow & Ely Bartlett*, *supra* at 520-521. No such abuse of discretion occurred here.

The fiduciary duty of "utmost good faith and loyalty" that shareholders in a close corporation owe to one another is derived from the strict standard of behavior applied to partnerships. *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, *supra*. This shared obligation, however, is not intended to hamper legitimate corporate activity unduly. "Where the alleged wrongdoer can demonstrate a legitimate business purpose for his action, no liability will result unless the wronged shareholder succeeds in showing that the proffered legitimate objective could have been achieved through a less harmful, reasonably practicable, alternative mode of action." *Zimmerman* v. *Bogoff*, 402 Mass. 650, 657 (1988), citing *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 851-852 (1976).

The judge based his denial of the defendants' motion for a new trial on the letter agreement and other events surrounding

the creation of Summerhill.[7] This evidence makes clear that all parties agreed the corporation was founded for the specific purpose of acquiring and building a housing subdivision on the land owned by Twin Hills in Dracut. The defendants contend that the discharge of the note and mortgage achieved the legitimate business purpose of earning profits for the corporation and its shareholders, including O'Brien. In turn, O'Brien contends that defendants ignored a reasonably practicable alternative that was less harmful to the original business purpose of Summerhill.

There was substantial evidence that the Shelzis' invitation to Summerhill to purchase the entire subdivision, as reported by Kahn on May 6, 1998, constituted a reasonably practicable, less harmful alternative course of action. Given the ultimate purchase price accepted by the Shelzis from Premier, the record supports the inference that further negotiations between Kahn and the Shelzis could have resulted in the acquisition of the entire subdivision within the realm of economic feasibility. Standing alone, however, such action is too amorphous to constitute a breach of fiduciary duty. See *O'Brien* v. *Pearson*, 67 Mass. App. Ct. 29, 38-39 (2006). More fundamentally, the evidence virtually compels the conclusion that the defendants made a decision, whether individually or through Kahn, to shift away from the animating purpose of Summerhill, as expressed through the signing of the March 16, 1998, letter of agreement and its surrounding discussions, toward the much narrower, if legitimate, purpose of pursuing a risk-averse effort to recoup the initial investment with some return. A reasonably practicable alternative course would have included a more open, communicative, and inclusive manner of engagement between the defendants and O'Brien. Without such a dialogue, the corporate sea change that occurred in Kahn's negotiations could be interpreted by the jury as a breach of fiduciary duty. As Chief

---

[7]The judge also based his decision, in part, on Kevin O'Brien's argument that the defendants committed a breach of their statutory duty under G. L. c. 156B, § 75, by selling Summerhill's primary asset without the assent of two-thirds of each class of stock outstanding and entitled to vote. See *Attorney Gen.* v. *Hahnemann Hosp.*, 397 Mass. 820, 828 (1986). We agree with the judge that this statutory violation did not amount to a breach of fiduciary duty. *O'Brien* v. *Pearson*, 67 Mass. App. Ct. 29, 40-41 (2000).

Judge Cardozo described it, the standard of behavior applicable here is quite rigorous: "Not honesty alone, but the punctilio of an honor the most sensitive . . . ." *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, *supra* at 594, quoting *Meinhard* v. *Salmon*, 249 N.Y. 458, 464 (1928).

The defendants' argument that O'Brien could not compel them to invest their own money misses the point. The defendants' breach did not arise from their failure to purchase the entire subdivision, but rather it occurred when they unilaterally decided, after promising to fund the project to the extent that it was economically feasible, to turn away from pursuit of the agreed-on objective in favor of their preferred alternative. The defendants' own evidence is not to the contrary. If there is one theme that pervades the testimony of Pearson, it is his delegation of authority in the negotiation process to the consultant, Joel Kahn. Kahn's testimony, in turn, indicates that at no time during his negotiation process to acquire the whole subdivision did he contemplate compensation to the Shelzis beyond the release of their obligation on the note and mortgage. The weighing of this evidence, in concert with the defendants' exclusion of O'Brien from the negotiation process and the parties' prior discussion of acceptable compensation to the Shelzis, created a valid basis for the judge's denial of the motion for a new trial. Although the conduct at issue here is far less typical than other circumstances falling under the elastic concept of corporate "freeze-out," see, e.g., *Coggins* v. *New England Patriots Football Club, Inc.*, 397 Mass. 525, 530-533 (1986), the effect is the same where "the majority effectively frustrate the minority stockholder's purposes in entering on the corporate venture," *Wilkes* v. *Springside Nursing Home, Inc.*, *supra* at 850, and deny "the minority's reasonable expectations of benefit." *Brodie* v. *Jordan*, 447 Mass. 866, 870 (2006). The jury were entitled to find that the defendants acted out of "avarice, expediency or self-interest," *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, *supra* at 593, despite over-all profits to the corporation and, derivatively, O'Brien. That these circumstances did not include a financial loss to the corporation does not preclude such a characterization. There was no abuse of discretion.

3. *Damages.* The jury returned a damages award of $900,000 against the defendants individually.[8] O'Brien's theory of damages assumed that the breach of fiduciary duty prevented him from sharing in profits he would have received from a completed subdivision. Based on his own testimony, as well as that of his expert, James Marotta, O'Brien sought to establish these lost profits to be forty-eight per cent of $4.5 to $5 million. Marotta's methodology was somewhat of a hybrid — synthesizing actual costs for certain stages of the project as it was subsequently built with estimates drawn from his own work. Marotta testified that, after Premier purchased the subdivision from the Shelzis, it built out the infrastructure, including roads, sidewalks, wetlands crossings and a pumping station, before selling the lots individually to One Line Realty (One Line). One Line, in turn, built houses on the lots and sold them to individual home buyers. Marotta's exhibits showed that the project, as built by Premier and One Line, largely conformed with the subdivision plan originally filed with the town of Dracut by Twin Hills.

Marotta estimated the total receipts from the completed subdivision to be approximately $18 million. Marotta estimated Premier's cost of building infrastructure at $2.5 million, a number he derived from his conversations with O'Brien, confirmed by his own analysis. Marotta also estimated the cost of building the houses on the lots, based in part on One Line's sales documents with certain subtractions and in part on his own analysis, at $10.2 million. His total estimate of lost profits was $4.4 million: the result of subtracting Premier's actual purchase price, plus the infrastructure, house building, and other miscellaneous costs, from the approximately $18 million gross

[8]The defendants argue on appeal that the judgment was flawed because it allowed for damages against them individually, rather than against the corporation, in effect piercing the corporate veil without sufficient justification. We disagree. A plaintiff seeking damages arising from a breach of fiduciary duty of the type here at issue does not challenge the defendants' actions vis-à-vis the corporation, but rather their shortcomings as between shareholders. We previously have allowed recovery against defendants as individuals in this context. See *Zimmerman* v. *Bogoff*, 402 Mass. 650, 660 (1988); *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 850-851, 854 (1976). See also Billings, Remedies for the Aggrieved Shareholder in a Close Corporation, 81 Mass. L. Rev. 3, 5 & n.19 (1996), and cases cited.

revenue amount. Marotta testified that this profit margin was within the normal range for developments of that size.

The defendants point to the testimony of Frederick P. Fahey, president and treasurer of Premier. Fahey testified that Premier lost "several hundred thousand dollars" on the project, despite having sold the lots to One Line for a total of $5.4 to $6 million. No complete itemized breakdown of Premier's actual costs was offered by either party. The defendants conclude that their decision to discharge the mortgage rather than build the subdivision likely saved the corporation and O'Brien from a profitless project and resulted in a handsome return.

Recovery of lost profits, as with all compensatory damages, requires a showing that the claimed losses were proximately caused by the wrongful conduct of the defendant. *H.D. Watts Co.* v. *American Bond & Mtge. Co.*, 267 Mass. 541, 552 (1929). *Lowrie* v. *Castle*, 225 Mass. 37, 51 (1916) ("Prospective profits may be recovered in an appropriate action when the loss of them appears to have been the direct result of the wrong complained of . . ."). Here, there is no doubt that there was a breach of fiduciary duty for which O'Brien was entitled to seek relief. The question is whether the facts prove within a reasonable degree of certainty that the breach, i.e., the wrongful conduct of the defendants, caused O'Brien to suffer the damages he sought to establish. See *Narragansett Amusement Co.* v. *Riverside Park Amusement Co.*, 260 Mass. 265, 281 (1927) ("Whether any profits would have resulted from the entertainments during the season of 1917 or in the four succeeding years was not proved with a reasonable degree of certainty"); *Gagnon* v. *Sperry & Hutchinson Co.*, 206 Mass. 547, 556 (1910) (requiring plaintiff to show "by reasonable proof that at least he certainly has lost some profits by the breach").[9] Further, the right of a plaintiff to recover damages based on prospective

___

[9] In evaluating O'Brien's claim, we are mindful of the distinction between the fact of damages arising directly from the fiduciary breach and the amount of those damages. The evidentiary burden on the fact of damages requires a more stringent degree of certainty. *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U.S. 555, 562-566 (1931). See W.A. Cerillo, Proving Business Damages § 111 (2d ed. 1991 & Supp. 1998); R.L. Dunn, Recovery of Damages for Lost Profits § 1.8, at 25 (6th ed. 2005). In this case, our analysis does not focus on O'Brien's burden of proving the amount of his lost

profits is a fact-specific inquiry that must be appropriately adapted to the circumstances of each case. *Rambola* v. *Cosindas*, 351 Mass. 382, 385 (1966).

We recently have considered the appropriate remedy for the freezeout of a minority shareholder of a similar nature. In *Brodie* v. *Jordan*, 447 Mass. 866, 870-871 (2006), we held that the appropriate remedy "should, to the extent possible, restore to the minority shareholder those benefits which [he] reasonably expected, but has not received because of the fiduciary breach." Such a remedy seeks to place the injured party in the same position as he would have been but for the breach. *John Hetherington & Sons* v. *William Firth Co.*, 210 Mass. 8, 10 (1911).

As explained above, the breach of fiduciary duty here that gives rise to the claim for damages manifested itself in the exclusion of the minority shareholder from information, participation, and decision-making, to the effect that the animating purpose of the corporation was altered without his involvement. The benefits to which O'Brien could claim a reasonable expectation, but were denied as a result of the fiduciary breach, would be involvement in the information sharing and decision-making of Summerhill. To claim that the corporation, and thus O'Brien, was deprived of the full benefit of a profitable subdivision as a direct result of this breach strains any definition of proximate cause. There simply lie too many contingencies and uncertainties between the breach and the completed subdivision to conclude otherwise.[10] A mutually

profits. Instead, we concern ourselves with the more fundamental question whether O'Brien has proved that the defendants' conduct proximately caused him damages in the first place.

[10]It is significant that Summerhill never reached internal agreement as to how it would develop the site. O'Brien testified that he had hired an engineer in December, 1997, just ten weeks prior to Summerhill's formation, to overhaul the design of the subdivision into a potentially more lucrative "open space" plan. The redesign was to be an alternative to the already approved Shelzi plan that would include smaller lot sizes, fewer roads, and more wooded area, requiring anew the approval of the project by town officials. The question whether to utilize this plan or the Shelzi plan was not resolved because Summerhill never obtained the property. This evidence underscores the discord of the viewpoint that existed among the parties — if they had not yet agreed on so basic a concept as the layout of the subdivision, it cannot be assumed that the immediate acquisition of the property would be at hand in the absence of the defendants' breach.

agreeable sale between Summerhill and the Shelzis was not the probable result of O'Brien's increased involvement in the information sharing and decision-making of the corporation. O'Brien's increased involvement would not have changed the interest of Premier, which may have responded to any bid from Summerhill with a higher offer of its own. As majority owners, the defendants, acting within a proper course of corporate conduct, could have asserted their right to "selfish ownership" to outvote O'Brien. *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 850-851 (1976). While O'Brien hoped that Summerhill would acquire and build the subdivision, he had no reasonable expectation that the proper conduct of his fellow shareholders made this result a foregone conclusion. O'Brien has not shown with reasonable certainty that he suffered compensable damages as a result of the defendants' breach.[11]

The unfortunate history of Summerhill presents "[m]anifest ambiguities in ascertaining what would have been the course of events in the face of complicated factors, under circumstances which never have come to pass . . . ." *Lowrie* v. *Castle, supra* at 52. The defendants' motion for a new trial should have been granted.[12] On remand, the fact finder must determine what damages were proximately caused by the fiduciary breach, i.e., the

---

[11]We note that the trial judge reached the same conclusion, articulated during his ruling on the defendants' posttrial motions: "I give no weight in terms of making my decision to the claim here of other assorted breaches of fiduciary duty, by way of a freezeout, failure to keep one informed or the failure to hold a shareholders' meeting . . . . None of these in [my] judgment could be thought to have caused economic harm on the order of nine hundred thousand dollars to Mr. O'Brien."

[12]This case demonstrates well the difference between the judgment notwithstanding the verdict and the new trial standards — it is the application of the standard that is dispositive here. Reviewing the evidence in the light most favorable to O'Brien, and disregarding evidence unfavorable to him, see *H.P. Hood & Sons* v. *Ford Motor Co.*, 370 Mass. 69, 71 (1976), the jury could have found some combination of circumstances to justify a reasonable inference supporting a $900,000 verdict. See *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 413 Mass. 119, 121 (1992). The generosity of this standard allows for the possibility of a jury's finding that greater inclusion of O'Brien in the affairs of Summerhill would have led to the acquisition of the property and construction of the subdivision in substantially the same manner that Premier Homes, Inc., and One Line Realty had. Such a conclusion, in concert with a favorable view of Marotta's testimony, could justify the jury verdict. Given O'Brien's evidence, there was no error in the judge's denial of the

exclusion of O'Brien from the business of the corporation, and award "to the minority shareholder those benefits which [he] reasonably expected, but has not received because of the fiduciary breach." *Brodie* v. *Jordan, supra* at 871. As the evidence now stands, "the elements, upon which the claim for prospective profits rests, are numerous and shifting contingencies," *Lowrie* v. *Castle, supra,* and result in a damages claim based in surmise and conjecture. By concluding that the jury's award reflected honest and reasonable judgment in accordance with controlling principles of law, the judge abused his discretion.

4. *Conclusion.* We remand the case to the Superior Court on the issue of damages only. The denial of the defendants' motion for a new trial is reversed as to the question of lost profits damages. The grant of O'Brien's motion to amend the judgment also is reversed.[13] The judgment of the Superior Court is affirmed in all other respects.

*So ordered.*

---

defendants' motion for a directed verdict or judgment notwithstanding the verdict on this issue.

[13] We comment briefly on the postverdict proceedings that resulted in the award to O'Brien of forty-eight per cent of the mortgage discharge proceeds to which he was entitled as a shareholder of Summerhill in addition to his jury verdict. The finding that O'Brien is entitled to forty-eight per cent of the mortgage proceeds is affirmed. However, O'Brien may not recover on a lost profits theory of damages while simultaneously benefiting from the course of action of which he complains. He may recover one or the other — to allow otherwise would result in a duplicative award. See *Rooney* v. *Paul D. Osborne Desk Co.,* 38 Mass. App. Ct. 82, 87 (1995). On remand, the judge may require O'Brien to elect between the two options. If he proceeds to trial on damages, the fact finder should be precluded from considering the forty-eight per cent of mortgage discharge proceeds to which O'Brien is otherwise entitled.