Miller, Rosalind H., J.
This action is before the court on remand. On June 23, 2015, the Appeals Court reversed the Court’s (Brady, J.) Judgment for the defendants, Ricci Consultants, Inc. (“RCI”) and Stephen J. Ricci (“Ricci”) on the plaintiff Linda L. Bournival’s (“Bournival”) breach of fiduciaiy duty claim. The Appeals Court set aside the Superior Court’s judgment and remanded the matter to the Superior Court for further proceedings as to the amount of damages, if any, caused by the breach of fiduciaiy duly.
At trial, the court heard testimony from Ricci and Bournival, and received 172 documents in evidence. Upon consideration of such testimony as the court finds credible, the exhibits, and the arguments of counsel, the court makes the following findings of fact, *408 rulings of law and order for entiy of judgment in this matter.
FINDINGS OF FACT
1. In October 1996 Stephen Ricci and Lynd Blatchford established RCI, an actuarial consulting firm. The core business of RCI was providing actuarial services pertaining to private pension and retirement plans. Ricci was a two-thirds majority shareholder, while Blatchford was a one-third minority shareholder. Ricci and Blatchford were the sole shareholders of RCI from 1996 until 2007.
2. Ricci had worked for various large actuarial firms for many years. While at one of those firms, he met Linda Bournival who was also an actuary. In 2006, Bournival contacted Ricci about the possibility of employment. The contact was timely because Blatchford was close to retirement and Ricci was hoping to replace him with a new partner with skill sets complementary to his. Bournival was more experienced in dealing with public sector retirement systems and there had been recent changes to state law and generally accepted accounting principles (GASB 45) that required that public pension/retirement systems be placed on a solid actuarial footing. Ricci anticipated that RCI’s private company pension work would decline, as many of the companies for whom he provided consulting services had terminated their pension plans and in general private firms were now less frequently providing pension plans for their workers.
3. Bournival became an employee of RCI in November 2006. RCI and Bournival entered into an employment agreement dated January 17, 2007. The employment agreement contemplated beginning discussion in July 2007 about Bournival becoming a shareholder in RCI. The agreement did not require any minimum number of billable hours. The agreement provided that the value of the enterprise for the purchase of shares was $450,000.
4. Blatchford retired. In July 2007, Bournival, after refinancing her primary residence, purchased Blatchford’s one-third ownership interest in RCI for $150,000. Ricci continued to be a two-thirds majority shareholder.
5. From July 2007 through March 2011 (the “Shareholder Period”), Ricci and Bournival were co-shareholders. Salaries paid by RCI to Ricci and Bournival were determined by Ricci on an annual basis. During the Shareholder Period, profits of RCI were generally distributed to Ricci and Bournival on a pro rata basis according to their ownership interest: two-thirds to Ricci, one-third to Bournival.
6. Ricci and Bournival worked reasonably well together for several years. Public sector business rose from a very small percentage to 15% of the firm’s revenues by 2010. However, the relationship between Ricci and Bournival began to deteriorate. Bournival was dissatisfied with a number of aspects of the relationship. In particular, she objected to the firm carrying life insurance on the two partners, with each responsible for the premium payment on the other’s life; because Ricci was much older, the premium on his policy was considerably greater than that on Bournival’s life. She also objected to the fact that RCI bought Ricci a car for $20,000, but did not provide anything for her. Bournival also objected to the firm’s profit sharing formula, which allocated substantially more of the annual profits to Ricci than to her. Bourni-val also felt that Ricci failed to attend to client matters in a timely fashion and hindered her completion of projects because he failed to complete required peer reviews.
7. Bournival committed her grievances to a memorandum on June 10, 2010, but did not provide the memo to Ricci. She did discuss the life insurance and profit sharing arrangements with Ricci, but he refused to alter them.
8. In late 2010, Bournival, who billed significantly more hours than Ricci, complained to Ricci about the imbalance of hours and said that she was overwhelmed. Exhibit #16. Although Ricci promised to pitch in, he failed to do so. The court finds that the imbalance was actually more significant than Bourni-val knew, because Ricci’s billable hours were inflated. Ricci a self-described “meticulous, overly compulsive timekeeper,” reviewed and altered Bournival’s timesheets, but she did not review or alter his.
9. Bournival consistently billed far more time than Ricci did on behalf of RCI. During the Shareholder Period, Bournival spent more than 1,400 hours on “billable” matters (excluding Ricci Estate matters) than Ricci. Exhibit #113. Ricci suggests that the imbalance in billable hours is not relevant; it is the total time that is important. The court does not find this argument persuasive. Ricci recorded 556.75 more total hours than Bournival during the Shareholder Period. Total hours includes billable hours, “business development,” “general,” “professional development,” “office/administration,” and “NEEBC.” Ricci accounted for practically every moment in the office including time spent on watering the plants, “voice,” cleaning (despite the fact that RCI employed a cleaning person), making personal appointments (Harvard Vanguard—eye appointment, Honda Village), “websites,” “Xmas,” megabucks, golf and filling out his NCAA brackets. (This is not an exhaustive list of the types of activities that Ricci accounted for under “general time” or administrative time.) Bournival did not record her time for such items.
10. During the Shareholder Period, Ricci devoted a substantial amount of his time at RCI on work for the “Ricci Estate,” a private family trust. The work performed on behalf of the Ricci Estate included creating and maintaining a database on the RCI server to keep track of the Estate holdings, tracking stocks to be *409 bought and sold, working with stockbrokers, drafting annual reports, and overseeing the charitable lead trust to make sure that there was cash on hand for the beneficiaries of the trust, including Ricci who received annual income from the Ricci Estate.[2] The Ricci Estate work was essentially private family business done by Ricci on RCI time.
11. RCI had in the past, charged the Ricci Estate for similar, nontraditional actuarial work.[3] However, despite the fact that the Ricci Estate benefited from this work, RCI did not bill the Ricci Estate for work after 1998. Ricci admitted that he did not think that RCI should bill for work done for the Ricci Estate since he and his family were benefiting from that work.
12. Ricci Estate work was classified as “billable” time on the company database, but Ricci never told Bournival that the time that he, Quintero and Eaton spent on the Ricci Estate was not being billed. Ricci’s characterization of RCI’s work for the Ricci Estate as “administrative,” and a reason the time was not billed is not credible. RCI performed non-actuarial administrative work for other clients, and was paid for that work. Ex. #151, 152, 153. I do not credit Ricci’s testimony that he continued to record the time as “billable,” just because he was a “creature of habit.”
13. During the Shareholder Period, the Ricci Estate did not pay RCI for the services provided by Ricci or by RCI support staff, Patty Quintero and Charlene Eaton. Bournival spent no time on the Ricci Estate.
14. During the Shareholder Period, Charlene Eaton spent approximately 2000 of her total “billable” time on Ricci Estate matters.[4] RCI paid Eaton $36 per hour and billed clients for her services at $110 per hour until 2009, and $125 per hour between 2009 and 2011. During the years that her billing rate was $110 per hour, Eaton spent 240.25 hours on the Ricci Estate. During the years that her billing rate was $ 125 per hour, Eaton spent 345.5 hours on the Ricci Estate. Ex #105.
15. During the Shareholder Period, Quintero spent approximately 19% of her total “billable” time on Ricci Estate matters.[5] RCI paid Quintero $15-$16 per hour and billed clients $70 per hour for her services. During the Shareholder Period, Quintero spent 232.5 hours on the Ricci Estate. Ex #104.
16. During the Shareholder period, Ricci spent approximately 23% of his total “billable” time on the Ricci Estate matters during the Shareholder Period.[6] RCI billed clients $300 per hour for Ricci’s services. (Bournival was also billed at $300 an hour.) Ricci spent 913.25 hours on the Ricci Estate during the Shareholder Period. Ricci’s work on the Ricci Estate slowed down his completion of important RCI tasks and made it more difficult for him to help Bournival keep up with her workload.[7]
17. The court does not credit Ricci’s testimony that there was “no such thing” as billable rates. Ricci set the billable rates. RCI did bill some customers on a flat rate basis, but I do not credit Ricci’s testimony that it billed all its public sector clients on a fixed-fee basis.
18. The court does not credit Ricci’s testimony that it was a benefit to RCI to pay Quintero and Eaton for the work that they did on the Ricci Estate matter, because it made it possible for RCI to keep them employed during periods when business was slow. There is nothing in the record to support that finding other than Ricci’s self-serving testimony.
19. During the Shareholder Period Ricci, Bournival, Eaton and Quintero all received more than base compensation, as they all received profit distributions.
20. The services provided by Eaton, Quintero and Ricci to the Ricci Estate, for free, significantly, and directly caused loss to RCI and to Bournival as a one-third shareholder.
21. The resulting loss of revenues to RCI is equivalent to the gain enjoyed by the Ricci Estate from the services provided. RCI lost the revenue that the Ricci Estate should have been required to pay in order to receive the services provided by Eaton, Quintero and Ricci.
22. During the Shareholder Period, RCI lost revenues of $69,615 attributable to the work performed for the Ricci Estate by Eaton. (240.25 x $110 + 345.5 x $125 = $69,615.) During that same period, RCI lost revenues of $16,275 attributable to the work performed for the Ricci Estate by Quintero. (232.5 x 70 = $16,275.) In addition, RCI lost revenues of $273,975 attributable to the work performed by Ricci for the Ricci Estate. (913.25 x $300 = $273,975.) Exhibit #113.
23. During the Shareholder period, RCI lost total revenues of $359,865.00 for work attributable to the Ricci Estate.
24. During the Shareholder Period, all expenses or overhead attributable to the Ricci Estate work, including, but not limited to the salaries of Ricci, Eaton and Quintero were absorbed by RCI before profits were distributed. Thus, as a shareholder, Bournival has already paid any expenses or overhead attributable to the work for the Ricci Estate through other clients.
25. RCI’s lost total revenues of $359,865 are therefore, actually lost profits.
26. Bournival’s pro rata one-third share of those lost profits is $119,955.
27. For the years 2007 through 2010, Ricci was paid W-2 compensation totaling $550,000 and Bournival was paid W-2 compensation totaling $590,000. During that same time RCI provided Ricci with $20,000 for avehicle. Bournival was not provided with money for a vehicle.
28. In April 2011 Bournival, who had retained a lawyer, contacted Ricci, told him that she was not satisfied with the partnership and requested that he pur *410 chase her shares for $150,000. Ricci responded that he would “shut this place down, before I pay you a dime.”[8]
29. Bournival had work in progress and clients whose needs had to be met. She offered to meet with Ricci about transitioning these client matters. She continued to work on RCI matters that she was responsible for until May 9, 2011 when she tendered her formal resignation.
30. On May 9, 2011, Bournival resigned as an Officer and Director of RCI. RCI paid her salary through April 30, 2011.
31. Bournival presented a proposal to Ricci by which work in which she was involved would be completed by her with a fee sharing agreement with RCI. Ricci did not respond.
32. In June 2011, Ricci sent letters to clients who had been serviced by Bournival informing them of her resignation and telling them that RCI was unable to perform the scope of services that Bournival, on behalf of RCI, contracted to perform.
33. Bournival was not paid for any work performed as an employee after April 30, 2011. Bournival received no actual distribution of profit or other pay as a shareholder of RCI in 2011, or in any year after that.
34. Bournival remains a shareholder of RCI, although Ricci considers her a shareholder “in name only.” Bournival has not been permitted to attend any meeting of shareholders or had any say in RCI’s business. In fact, RCI paid for litigation against Bournival. Exhibit #112. Bournival does not wish to remain a shareholder in RCI, but Ricci/RCI have refused to repurchase her shares for any value.
35. After leaving RCI, Bournival began her own actuarial consulting firm, KMS Actuaries, Inc. (“KMS”) and Ricci started Ricci Consultants, LLC, a separate entity from RCI. Ricci serves as President of both RCI and the LLC. The LLC provides the same kind of services that RCI did.
36. After Bournival left RCI, RCI’s revenues decreased from $503,283 for 2011 to $129,269 for 2012. The losses suffered by RCI are not attributable to Bournival, but to the conduct of Ricci. Bournival’s departure did not leave RCI totally unable to carry out the public sector contracts which she had entered into. Bournival offered to transition these clients through a fee splitting arrangement, an arrangement that would likely have been less costly to RCI than paying her salary. Ricci could have hired someone to carry out her responsibilities for public-sector work; or, if he desired, he could complete the work himself. Ricci refused to consider these alternatives. Furthermore, much of the loss suffered by RCI is attributable to hundreds of thousands of dollars in legal fees incurred in litigating this case and a companion case against Ms. Bournival. After Bournival left, Ricci assigned most of the assets of RCI to himself or to Ricci Consultants, LLC with the purpose of rendering Bournival’s one-third share in RCI worthless.
37. Bournival reported losses associated with RCI to the IRS for the tax years 2011 through 2014 resulting in a reduction in her income tax. The losses are not attributable to the conduct of Bournival, but to the conduct of Ricci. Furthermore, upon resigning, Bournival requested that RCI repurchase her shares, but RCI and Ricci refused. The offer to purchase her shares for $10 cannot be considered a good faith offer.
38. Following her departure Ricci and Bournival commenced lawsuits against each other alleging intentional interference with contractual/advantageous relations with customers and breach of fiduciary duty.
39. The interference claims were tried to a jury. The jury found in favor of Bournival on her interference claims and also found in favor of RCI’s interference claims against her. The breach of fiduciary duty claims were tried before the Court (Brady, J.).
40. At the end of 2015, the Ricci Estate had assets worth approximately $5 million.
41. The matter is before this court only as to the issue of damages, if any.
RULINGS OF LAW
1. Ricci, a majority stockholder in a close corporation, owed a fiduciary duly “of utmost good faith and loyalty” to Bournival. See Fronk v. Fowler, 456 Mass. 317, 333 n.23 (2010); Donahue v. Rodd Electrotype Co., 367 Mass. 578, 593 (1975); Vakil v. Anesthesiology Associates of Taunton, Inc., 51 Mass.App.Ct. 114, 118 (2001).
2. As found by the Appeals Court, Ricci violated his fiduciary duties. See Appeals Court Order at 10.
3. The Superior Court has broad equitable power to fashion a remedy for breach of fiduciary duty. Brodie v. Jordan, 447 Mass. 866, 871 (2006).
4. When the breach of fiduciary duty involves the denial of a party’s reasonable expectation of benefit, the remedy should, to the extent possible, restore the benefit reasonably expected but not received because of the fiduciary breach. Id. at 870-71.
5. A claim based on breach of fiduciary duty “is an equitable claim against individual stockholders.” Merola v. Exergen Corp., 423 Mass. 461, 464 (1996).
6. Ricci’s breach of fiduciary duty prevented Bournival from sharing in profits that she would have received from revenues that should have been collected for work performed by Ricci, Eaton and Quintero for the Ricci Estate. A plaintiff seeking damages from a breach of duly such as this, may recover damages against defendants as individuals. O’Brien v. Pearson, 449 Mass. 377, 387 (2007).
7. “Recovery of lost profits, as with all compensatory damages, requires a showing that the claimed losses were proximately caused by the wrongful conduct of the defendant.” Id. at 388. Bournival met that burden; the damages suffered by Bournival arose directly from *411 Ricci’s decision to provide the Ricci Estate with significant services, free of charge. Those services enriched Ricci and his family at the expense of RCI and Bourni-val.
8. Bournival proved the amount of lost profits with a reasonable degree of certainty.
9. RCI lost $359,865 of revenue for work performed for the Ricci Estate for no charge.
10. The revenue is actually lost profits, because overhead and expenses related to the work for the Ricci Estate have already been accounted for.
11. Bournival’s damages are a pro rata, one-third share of the $359,865 in lost profits, $119,955.
12. Although Ricci and RCI asserted an affirmative defense based on the statute of limitations in their Answer to the Amended Complaint, that defense has been waived.
ORDER FOR JUDGMENT
Judgment shall enter on Count II (breach of fiduciary duty): judgment for the plaintiff Linda Bournival, against RCI and Ricci for $119,955 together with prejudgment interest at the statutory 12% rate from the date of the filing of the Complaint and such postjudgment interest and costs as are allowed by law. The judgment is joint and several against RCI and Ricci. The Court further orders that the judgment in this case shall be paid directly to Bourival by the defendants, and not through RCI.

 I do not credit Ricci’s testimony that he had “no idea” how much income he, his wife and children received from the Ricci Estate

 In 1998, RCI billed the Ricci Estate approximately $12,000 for professional services.

 Eaton’s total base compensation for the Shareholder Period was $148,034.75. 20% of Eaton’s base compensation, representing the portion of billable time spent on the Ricci Estate, is $29,606.95.

 Quintero’s base compensation for the Shareholder period was $96,685.75 19% of Quintero’s base compensation, representing the proportion of billable time spent on the Ricci Estate, is $18,370.29.

 Ricci’s total base compensation for the Shareholder Period was $490,025.00. 23% of Ricci’s base compensation, representing the portion of total time spent on the Ricci Estate, is $112,705.75.

 After Bournival complained about being “overwhelmed,” the amount of time that Ricci spent on the Ricci Estate actually increased.

 During the litigation, the Court (Brady, J.) deemed Bournival a shareholder Soon thereafter, Ricci offered Bournival $10 for her shares. Exhibit #168.