NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-123

JAMES COYNE[1]

vs.

R.J. REYNOLDS TOBACCO COMPANY.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Pamela Coyne began smoking cigarettes as a young teenager, became addicted to them, and died an untimely death from lung cancer in 2016. She was fifty-eight years old. Primarily, she smoked Winston cigarettes. Her husband, James Coyne, individually and as personal representative of Pamela's estate,[2] brought this action against the manufacturer of Winston cigarettes, R.J. Reynolds Tobacco Company (R.J. Reynolds), for negligent marketing, conspiracy, breach of warranty, and violation of G. L. c. 93A. Following a trial, the jury found in James's favor on his claims for negligent marketing, conspiracy, and breach of warranty, and awarded $6,314,233 in compensatory

_____

[1] Individually and as personal representative of the estate of Pamela Coyne.

[2] We refer to Pamela and James Coyne by their first names to avoid confusion.

damages and $11,275,000 in punitive damages.  The judge also found in James's favor on his claim for violation of G. L. c. 93A but awarded no additional damages.  R.J. Reynolds seeks reversal.  We agree with R.J. Reynolds that the evidence was insufficient to support James's negligent marketing claim and that, accordingly, the award of punitive damages must be vacated and remanded for a new trial.  In all other respects, we affirm.

1.  <u>Sufficiency of the evidence</u>.  R.J. Reynolds raised and preserved its arguments regarding the sufficiency of the evidence through motions for directed verdict and for judgment notwithstanding the verdict.[3]  We review motions for directed verdict and for judgment notwithstanding the verdict "under the same standard used by the trial judge."  <u>O'Brien</u> v. <u>Pearson</u>, 449 Mass. 377, 383 (2007).  We "construe the evidence in the light most favorable to the nonmoving party and disregard that favorable to the moving party."  <u>Id</u>.  "Our duty . . . is to evaluate whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be made in favor of the [nonmovant]" (quotation omitted).  <u>Id</u>.

---

[3] The trial judge initially granted R.J. Reynolds's motion for directed verdict as to James's claim for negligent marketing but then reconsidered and reversed that decision.

2

a.  Negligent marketing.  James's negligent marketing claim was tried on the theory that when Pamela was a minor, R.J. Reynolds had a duty to avoid marketing cigarettes in a manner calculated to induce purchases by minors and that R.J. Reynolds violated that duty, causing Pamela to start smoking.  See Evans v. Lorillard Tobacco Co., 465 Mass. 411, 444 (2013).  For purposes of this appeal, R.J. Reynolds does not dispute that it had such a duty or that it violated that duty.  R.J. Reynolds does argue, however, that there was insufficient evidence to support the conclusion that R.J. Reynolds's negligence caused Pamela to start smoking.  As noted, we agree.

James relies on evidence showing that, when Pamela was a child, R.J. Reynolds had a pervasive and successful advertising campaign targeted toward the youth market, and that Pamela surely saw R.J. Reynolds's advertisements as a child.  However, the existence of the advertising campaign, even if pervasive and successful, does not show why Pamela began smoking, and no other evidence linked Pamela's decision to start smoking to anything that R.J. Reynolds said or did.  There was no testimony from Pamela regarding why she began smoking, as she died before James brought this action.  Two witnesses, Pamela's sister and a childhood friend, testified regarding Pamela's earliest years as a smoker.  They testified that Pamela began smoking when she was around fourteen years old by stealing cigarettes from family

3

members.  Neither knew whether R.J. Reynolds said or did anything that influenced Pamela's decision to start smoking.[4] Instead, Pamela's sister testified that Pamela smoked because "everybody" smoked back then and that, at their house in particular, "[s]moking cigarettes was like eating dinner" or "like brushing your teeth."

While direct evidence regarding why someone began smoking is not required, a reasonable inference "must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture" (quotation omitted). Reading Co-Op. Bank v. Suffolk Constr. Co., 464 Mass. 543, 556 (2013).  As other courts have concluded, evidence of a tobacco company's advertising or disinformation campaign, in and of itself, is insufficient to establish that the marketing or disinformation campaign influenced someone's decision to start smoking.  See Prentice v. R.J. Reynolds Tobacco Co., 338 So.3d 831, 836, 840 (Fla. 2022) (resolving disagreement among lower courts, concluding that for fraudulent concealment and conspiracy claims, tobacco plaintiff must show reliance on statement and not merely appeal to tobacco company's disinformation campaign).  See also Brown v. Philip Morris Inc.,

---

[4] In addition to Pamela's sister and childhood friend, two other witnesses knew Pamela as a child -- her half-brother and a neighbor she babysat.  They, too, were unaware whether R.J. Reynolds said or did anything that influenced Pamela's decision.

4

228 F. Supp. 2d 506, 518-520 (D.N.J. 2002); Tompkins v. R.J. Reynolds Tobacco Co., 92 F. Supp. 2d 70, 82-83 (N.D.N.Y. 2000). There must be some evidence, even if circumstantial, linking the person's decision to start smoking with something the tobacco company said or did.  See, e.g., Boeken v. Philip Morris, Inc., 127 Cal. App. 4th 1640, 1661-1663, 1666-1667 (2005), cert. denied, 547 U.S. 1018 (2006) (circumstantial evidence sufficient where, even though plaintiff could not identify advertisement that caused him to start smoking, his stated reasons for beginning to smoke tracked advertising campaign).  Here, because there was no evidence making that link, a directed verdict should have entered on James's negligent marketing claim in R.J. Reynolds's favor.[5]

   b.  Conspiracy.  The jury found R.J. Reynolds liable of conspiracy on a concerted action theory, which required James to prove "an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement."  Bartle v. Berry, 80 Mass. App. Ct. 372, 383-384 (2011).  Here, James alleged the underlying tortious act of misrepresentation, which required James to prove a false

---

[5] In reaching the contrary conclusion, the trial judge focused on the fact that Pamela often repeated a Winston advertising phrase -- "Winston tastes good like a cigarette should" -- as an adult.  However, the mere fact that Pamela was familiar with this phrase, which Winston used into Pamela's adulthood, says nothing about why she began smoking as a young teenager.

representation of material fact, made with knowledge of or in reckless disregard of the truth and with the intent to induce reliance, and actual reliance.  See Sullivan v. Five Acres Realty Trust, 487 Mass. 64, 73 (2021); Christian v. Mooney, 400 Mass. 753, 764 (1987), cert. denied, 484 U.S. 1053 (1988).

In support of this claim, James offered the expert testimony of Dr. Robert Neal Proctor[6] that the cigarette industry created the concept of "light" cigarettes in response to market research showing that smokers would switch to "lights" thinking that they were healthier, when in fact the cigarette industry knew that "lights" were just as harmful as other cigarettes.[7] There was also evidence that, unlike with Pamela's negligent marketing claim, Pamela did in fact rely on this specific disinformation.  James testified that Pamela began smoking

---

[6] Dr. Proctor is a professor of the history of science at Stanford University and has researched the tobacco archives, which include eighty-five million pages of the industry's formerly internal business records.

[7] R.J. Reynolds argues that (1) James failed to point to a specific statement made by R.J. Reynolds that "light" cigarettes were healthier and (2) Dr. Proctor testified that no such statements were made because the cigarette industry did not want to imply that other cigarettes were unhealthy.  However, the jury reasonably could have found that R.J. Reynolds created a "smoke screen of deception and misinformation" calculated to mislead smokers that "light" cigarettes were healthier, without directly making that statement.  Greene v. Philip Morris USA Inc., 491 Mass. 866, 873 (2023).  See Sullivan, 487 Mass. at 73 ("Deception need not be direct to come within the reach of the law.  Declarations and conduct calculated to mislead and which in fact do mislead one who is acting reasonably are enough to constitute fraud" [quotation omitted]).

Winston lights in 1987 "because she believed it would be easier to quit." One of Pamela's daughters similarly testified that Pamela switched to Winston lights thinking that they were "healthier" and "a road to quitting."[8] However, Pamela's smoking did not decrease after she switched to Winston lights, and instead increased. Lastly, James offered the expert testimony of an oncologist that Pamela's decision to smoke Winston lights, instead of quitting,[9] contributed to her lung cancer. Based on this evidence, the jury reasonably concluded that R.J. Reynolds was liable for conspiracy.[10]

   c. <u>Breach of warranty</u>. To prevail on his breach of warranty claim, James had to prove that "the foreseeable risks of harm posed by [Winston cigarettes] could have been reduced or

---

[8] While R.J. Reynolds argues that Pamela may have come to believe that Winston lights were a "healthier" option from some source other than R.J. Reynolds, this argument does not view the evidence in the light most favorable to James.

[9] We are unpersuaded by R.J. Reynolds's arguments that Pamela knew of the dangers of smoking, that Pamela did not take her health seriously, and that she would have smoked regardless of what R.J. Reynolds said or did. These arguments do not view the evidence in the light most favorable to James. Aside from the evidence showing that Pamela viewed Winston lights as healthier, several witnesses testified that she wanted to and tried quitting. See, e.g., <u>Greene</u>, 491 Mass. at 874-875.

[10] Dr. Proctor also testified that the cigarette industry created a similar disinformation campaign regarding filtered cigarettes. Given our conclusion that there was sufficient evidence to support James's claim for a conspiracy based on misrepresentations made about "light" cigarettes, we do not address whether there was sufficient evidence to support James's claim for conspiracy based on misrepresentations regarding filtered cigarettes.

7

avoided by the adoption of a reasonable alternative design . . . and the omission of the alternative design render[ed] the product not reasonably safe." Evans, 465 Mass. at 424, quoting Restatement (Third) of Torts: Products Liability § 2 (b), at 14 (1998). James offered several alternative designs. We focus our conversation on one of those designs, low-nicotine cigarettes. The jury heard expert testimony from Dr. K. Michael Cummings[11] that low-nicotine cigarettes have .2 to .7 milligrams of nicotine,[12] whereas traditional cigarettes have 7.5 to 14 milligrams of nicotine, and that someone who starts smoking low-nicotine cigarettes is unlikely to develop an addiction to nicotine, making it easier for them to quit smoking. The jury further heard that the technology to remove the high levels of nicotine from cigarettes existed long before Pamela began smoking. Based on this evidence, the jury reasonably concluded that there was a reasonable alternative design. See, e.g., Evans, 465 Mass. at 431-439.[13]

---

[11] Dr. Cummings is a professor in the department of psychiatry and behavioral science at the Medical University of South Carolina and is the Director of the Tobacco Cessation service there.

[12] Dr. Cummings explained that low-nicotine cigarettes are very different from the "light" cigarettes previously marketed, which he testified were "more like normal cigarettes in terms of delivery of nicotine."

[13] Where the evidence regarding low-nicotine cigarettes was sufficient to affirm the jury's verdict on this claim, we do not address the two other alternative designs proposed by James: non-inhalable cigarettes and heat-not-burn cigarettes.

R.J. Reynolds's argument to the contrary is unavailing. R.J. Reynolds argues that low-nicotine cigarettes suffer from the same defect as traditional cigarettes, in that they are inhalable and if smoked in sufficient quantities also cause lung cancer. However, there was evidence that traditional cigarettes suffer from another defect, their addictiveness, and that had Pamela not been addicted to cigarettes, she would have stopped smoking, thereby reducing her chances of dying of lung cancer. Thus, a low-nicotine cigarette that eliminated this defect was a reasonable alternative design that would have reduced the foreseeable risks of harm posed by the product.

d. _Violation of G. L. c. 93A_. R.J. Reynolds argues that James's c. 93A claim was limited to conduct occurring at least after 1979,[14] when the Legislature amended c. 93A to broaden its scope. See _Evans_, 465 Mass. at 464, citing _Hershenow_ v. _Enterprise Rent-A-Car Co. of Boston, Inc_., 445 Mass. 790, 797-798 (2006). Regarding James's conspiracy claim, R.J. Reynolds argues that the evidence was insufficient for the period after 1979 because the risks of smoking became more well known as time went on, and that it was therefore speculative to infer that

---

[14] In a footnote, R.J. Reynolds argues that the claim "[a]ctually . . . should be limited to conduct that occurred after July 7, 1983." We need not address this argument, as the trial judge found that R.J. Reynolds's unfair and deceptive acts and practices continued after 1983, and as we explain in the text, there was evidence to support this finding.

Pamela relied on anything R.J. Reynolds said after 1979. This argument does not view the evidence in the light most favorable to James. As we have discussed, there was evidence that, in 1987, Pamela relied on the disinformation campaign regarding "light" cigarettes and switched to Winston lights as a "healthier" option and "a road to quitting." Regarding James's breach of warranty claim, R.J. Reynolds argues that with the passage of time, it became less likely that Pamela could have avoided her injuries by using one of the proffered alternative designs.[15] Again, this argument does not view the evidence in the light most favorable to James, as there was evidence that each decade that Pamela smoked contributed to her lung cancer.

2. <u>Punitive damages</u>. Where we have reversed on James's claim for negligent marketing, we must also vacate the jury's award of punitive damages, which was based on findings that R.J. Reynolds acted in a manner that was (1) malicious, willful, wanton, or reckless and (2) grossly negligent.[16] On the record

---

[15] As R.J. Reynolds clarified in its reply brief, its argument on this point is that "by 1979, [Pamela] had already been smoking for about a decade, and there is no evidence from which to reasonably infer that Reynolds's conduct <u>thereafter</u> (as opposed to <u>before</u>) is what caused her injury and death."

[16] We are unpersuaded by James's argument that R.J. Reynolds waived the issue by failing to object to the jury verdict form. This argument is unavailing where R.J. Reynolds does not challenge the jury verdict form, and instead argues that where we have reversed on James's negligent marketing claim, the award of punitive damages must be vacated. On this point, R.J. Reynolds's motions for directed verdict and for judgment

before us, we cannot ascertain whether the jury's findings on these points were based on R.J. Reynolds's acts in marketing cigarettes to minors, in conspiring with the cigarette industry to mislead the public, in failing to adopt a reasonable alternative design, or all of the above.  Where the jury may have based at least some portion of the punitive damages on R.J. Reynolds's acts in marketing cigarettes to minors, the award of punitive damages must be vacated.  See, e.g., Evans, 465 Mass. at 448; Bain v. Springfield, 424 Mass. 758, 769 (1997).[17]

3.  Statutory prejudgment interest.  R.J. Reynolds raises two additional arguments regarding the statutory prejudgment interest that was applied to the award of compensatory damages.  First, R.J. Reynolds argues that the current statutory rate of twelve percent per annum is unconstitutional.  However, the Supreme Judicial Court recently addressed this argument and concluded that the statutory rate of twelve percent per annum survived rational basis review.  See Greene v. Philip Morris

---

notwithstanding the verdict preserved the issue.  See, e.g., Bain v. Springfield, 424 Mass. 758, 761-762 (1997) (where two of three possible bases for punitive damages were held improper, motion for directed verdict that evidence was insufficient preserved argument that punitive damages were excessive).

[17] The jury's award of compensatory damages stands on different footing, as "a jury's award of compensatory damages may be affirmed on appeal on one theory of liability even where an appellate court finds instructional error or insufficiency of evidence as to another theory."  Evans, 465 Mass. at 423 n.7.

11

USA, Inc., 491 Mass. 866, 884-885 (2023).  We are bound by that conclusion.

Second, R.J. Reynolds argues some of the damages awarded were intended to compensate James, as well as Pamela's four children, for future harm -- for the "loss of services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of [Pamela]" -- and that the trial court erroneously applied statutory prejudgment interest to these compensatory damages.  R.J. Reynolds relies on Conway v. Electro Switch Corp., 402 Mass. 385, 391 (1988), in which the Supreme Judicial Court held that in G. L. c. 151B cases, statutory prejudgment interest could not "be said to apply to an award of damages based on lost earnings and benefits occurring after the date of judgment."  However, as this court has since noted, the holding in Conway was specific to c. 151B cases.  See Kuppens v. Davies, 38 Mass. App. Ct. 498, 499-500 & n.6 (1995).  In this tort action, G. L. c. 231, § 6B, required the trial court to compute the statutory prejudgment interest on the entire award of compensatory damages.  See id.

4.  Conclusion.  So much of the judgment as holds R.J. Reynolds liable for negligent marketing is reversed, and the

award of punitive damages is vacated and remanded for a new trial.  In all other respects, the judgment is affirmed.

So ordered.

By the Court (Meade, Desmond & Hand, JJ.[18]),

*Joseph F. Stanton*

Clerk

Entered:  May 30, 2023.

---

[18] The panelists are listed in order of seniority.