Presented for decision is Plaintiff and Defendant-in-Counterclaim's Rule 59 Motion for Judgment Notwithstanding the Verdict and Rule 50 Motion for a New Trial. These motions follow the conclusion of more than four years of litigation and a five-day trial, in which a unanimous jury returned verdicts in favor of Defendant and Counterclaimant Foundation Medicine, Inc. ("FMI" or the "Defendant") and against Plaintiff and Defendant-in-Counterclaim Susan Miele ("Miele" or the"Plaintiff'). By these verdicts, the jury found that Miele had violated the non-solicitation provisions of the Restrictive Covenants Agreement incorporated into her Transition Agreement, thereby entitling FMI both to withhold payment of $228,778.88 in otherwise owing severance benefits and to compel Ms. Miele to forfeit and repay to FMI
$952,150 in previously received severance benefits. The parties stipulated to these amounts at trial, thereby obviating the need for the jury to calculate and assess the contract damages.
 
                                                            -1-
 
            In her post-trial motions, Plaintiff argues that (1) a contractual clawback of the $952,150 in severance benefits paid to Ms. Miele under the Transition Agreement constitutes an improper forfeiture, because Ms. Miele had already earned these benefits for past services to FMI; (2) Ms. Miele may only be held liable for the "net" amount of forfeitable severance benefits she received, and not for the full pre-tax amount actually paid to her (or on her account) by FMI; (3) the Court erred in construing the Transition Agreement to impose restrictive covenant obligations on Ms. Miele that ran for one year following her December, 2020 separation from FMI, rather than one year following the February, 2020 date when she first received notice of the termination of her employment; (4) the Court's instructions to the jury erroneously broadened to ''attempt to hire" the text of the Transition Agreement, which provided only that Ms. Miele could not "solicit, entice or attempt to persuade any other employee or consultant of [FMI] to leave the services of the Company for any reason or otherwise participate in or facilitate the hire, directly or through another entity, of any person who is employed or engaged by the Company . . . ";and (5) the Court erred in admitting into evidence (and allowing argument to the jury on the basis of same) that Ms. Miele violated the Transition Agreement by soliciting Jackie Pfeifer to leave FMI and join Gingko Bioworks ("Gingko") in the Fall of 2021, after-acquired evidence obtained months after FMI had cited Ms. Miele for a material breach of this contract in May, 2021. These contentions of error are addressed infra.
 DISCUSSION
I. STANDARDS OF REVIEW
            The standard for allowance of a JNOV motion under Mass. R. Civ. P. SO(b) is well established inour case law. The trial judge must determine whether, in light of all the evidence, viewed in the light most favorable to the prevailing party, and without weighing the relative
 
                                                            -2-
credibility of witnesses, the jury could reasonably return a verdict in favor of that party. Phelan
v. May Dept. Stores Co., 443 Mass. 52, 55 (2004); Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432,438 (1992); Tosti v. Ayik, 394 Mass. 482,494 (1985); Lally v. Volkswagen Aktiengesellschaft, 45 Mass. App. Ct. 317. 321 (1998). Stated differently, a motion for JNOV may properly be granted only where, construing the evidence most favorably to the non-moving party, and regardless of the source of such evidence, "[no] combination of circumstances could be found from which a reasonable inference could be drawn in favor of the [prevailing party]." Haddad v. Walmart Stores, Inc., 455 Mass. 91, 94 n.5 (2009). Accord O'Brien v. Pearson, 449 Mass. 377,383 (2007); Freeman v. Planning Bd. of West Boylston, 419 Mass. 548,550 (1995).
            "Relief is appropriate under a motion for judgment nov ' [o]nly when no rational view of the evidence warrants a finding for [the non-moving party] ...."' Quarterman v. Springfield, 91 Mass. App. Ct. 254, 257-58, rev. denied, 477 Mass. 1107 (2017) (alteration in original), quoting Mullins v. Pine Manor Coll., 389 Mass. 47, 56 (1983). If any combination of circumstances would permit a :finding in favor of the prevailing party, the existence of other facts such as would allow for a contrary :finding is of no consequence. Deerskin Trading Post Inc. v. Spencer Press, Inc., 398 Mass. 118, 125 (1986); Austin v. Dertsakian, 85 Mass. App. Ct. 1105, 2014 WL 916642, at *l (Mar. 11, 2014) (Rule 1:28). "It is ofno avail for [a party] to argue that there was some or even much evidence which would have warranted a contrary finding by the jury." Coady v. Wellfleet Marine Corp., 62 Mass. App. Ct. 237, 248 (2004), quoting Tosti, 394 Mass. at 494. The Court may not substitute its judgment of the evidence for that of the jury, see Meyer v. Wagner, 57 Mass. App. Ct. 494, 500 (2003), unless, drawing all inferences and resolving all conflicts in favor of the verdict, no reasonable trier of fact could have found as the jury did on a reasonable application of the law. O'Brien, 449 Mass. at 382, citing Robertson v. Gaston Snow,
 
                                                            -3-
 
404 Mass. 515, 520 (1989). "Because the jury are a pillar of our justice system, nullifying a jury verdict is a matter of the utmost judicial circumspection." Cahaly v. Benistar Prop. Exch. Trust Co.• 451 Mass. 343, 350, cert. denied, 555 U.S. 1047 (2008).
            In the alternative, Mass. R. Civ. P. 59(a) affords the trial judge, in the exercise of sound discretion, the prerogative to set aside a jury verdict and order a new trial when the verdict is so contrary to the weight of the evidence that it appears to have been "the product of bias, misapprehenison or prejudice." Bailey v. Kane, 92 Mass. App. Ct. 1120, 2017 WL 6625243, at *2 (Dec. 29, 2017) (Rule 1:28), quoting Jamgochian v. Dierker, 425 Mass. 565,571 (1997). The standard for obtaining a new trial favors the moving party more than that required for a JNOV, involving as it does an evaluation of the probative force of the evidence in addition to whether such evidence simply exists. See O'Brien, 449 Mass. at 384. "Judgesare not, however, permitted to substitute their own viewof the evidence for that of the jury." Passaternpo v. McMenimen, 86 Mass. App. Ct. 742, 746 (2014), citing Hartmann v. Boston Herald-TravelerCorp•.  323 Mass. 56. 60 (1948). As with a motion for JNOV, the Court will not disturb a jury's verdict merely because the result would have beendifferent bad the judge presided over the trial as its finder of fact. Clapp v. Haynes, 11 Mass. App. Ct. 895, 896 (1980) (rescript), rev. denied, 383 Mass. 890 (1981). A verdict will be set aside in favor of a new trial only if it is so demonstrably at variance with the weight of the evidence as to suggest that the jury "failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law." Robertson, supra at
520, quoting Hartmann, 323 Mass. at 60. Accord Turnpike Motors. Inc. v. Newbury Grp., Inc., 413 Mass. 119, 127 (1992) (test for new trial is whether "the verdict is so greatly against the weight of the evidence as to induce ... the strong belief that it was not due to a careful consideration of the evidence"); W. Oliver Tripp Co. v. American Hoechst Corp., 34 Mass. App.
 
                                                            -4-
 
Ct. 744, 748 (1993) (reviewing court must be persuaded that ''the verdict is so markedly against the weight of the evidence as to suggest that the jurors allowed themselves to be misled, were swept away by bias or prejudice, ... or failed to come to a reasonable conclusion").
            The foregoing standards reflect the considerable deference that jury verdicts are due in our constitutional system. Our appellate courts have thus repeatedly emphasized that JNOVs and orders for new trial should be granted "cautiously and sparingly." Matley v. Minkoff, 68 Mass. App. Ct. 48, 52 (2007); Netherwood v. AFSCME, 53 Mass. App. Ct. 11, 20 (2001). Only where judicial intrusion is required to avert a manifest miscarriage of justice should allowance of one of these motions be granted. See Morgan v. Laboratory Corp. of Am., 65 Mass. App. Ct. 816,822 (2006). These settled principles of law form a critical backdrop to any proper consideration of the evidence in connection with post-trial motions like the Plaintiffs. Applying these standards to the case at bar, the Court has no hesitation whatsoever concluding that Plaintiffs motions for post-trial relief must be denied.
II. PLAINTIFF'S POST-TRIAL CLAIMS OF ERROR
            Plaintiff does not(and could not)argue that the verdicts in this case stand against the weight of the evidence, that the trial evidence permits no findings in favor of FMI as a matter of law, or that the verdicts are so at variance with the evidence as to suggest that the jury acted out of bias, misapprehension or prejudice. Plaintiffs motions for judgment notwithstanding the verdict or, alternatively, for a new trial instead rest upon five specific claims of legal error. These claims are addressed in turn.
            A. TRANSITION AGREEMENT'S CLAWBACK PROVISION
            Plaintiff argues, as she has throughout the litigation, that FMI s clawback of the $952,150 paid to her in severance benefits under the Transition Agreement represents an unlawful forfeiture,
 
                                                            -5-
 
because such benefits (viz., cash paid for her unvested equity grants as of December 15, 2020) constituted "earned compensation for Ms. Miele's past services." The Court does not agree.
            First, Plaintiff's reliance on cases such as Cummings Props. v. National Commc'ns  Com., 449 Mass. 490 (2007) and Cheney v. b..Y!.01J:18,ti9$P,ijnk.ler Com. of Am., 397 Mass. 141 (1979), is misplaced.  Ms.  Miele's  Transition  Agreement  with  FMI  involved  neither  a  liquidated damages clause (Cummings) nor a forfeiture-for-competitionprovision (Cheney). Such contracts implicate very different  concerns,  and are  subject to  a  far  more exacting  scrutiny, than the non-solicit covenant  to  which  Ms.  Miele committed  in  the  Transition Agreement. See, e.g. Automile Holdings. LLC v. McGovern, 483 Mass. 797, 812 (2020) (covenant not to solicit did not "present the same concerns as traditional noncompetition agreements the employment context," as it did not  "directly  prohibit[] an    employee  from  going  to  work  for  a  competitor  within  a  certain geographic region" and thus did not "implicate concerns about an individual's ability to earn a living and to protect against a monopoly to the same extent as a traditional noncompetition agreement").
            Second, the foundational predicate for Plaintiff's argument- viz., that FMI's enforcement of the Transition Agreement's clawback provision deprives her of previously earned compensation for past services - is belied by the undisputed evidence at trial. That Ms. Miele received her equity grants prior to entering into the Transition Agreement is immaterial, inasmuch as such equity remained unvested as of her last day of employment. It is well settled that unvested equity, subject to   either  acceleration   or   forfeiture   based  on   future  events,  does  not  constitute  "earned compensation." See Harrison v. NetCentric Corp., 433 Mass. 465, 466 (2001) ("The defendants did not deprive the plaintiff of any income that he reasonably earned or to which he was entitled. His shares [of stock] vested over time only if  he continued to  be employed;  thus, the unvested
 
                                                            -6-
 
shares are not earned compensation for past services, but compensation contingent on his continued employment'').
            This Court (Pineault, J.) previously held that the Transition Agreement works no unlawful penalty or forfeiture of earned compensation for past services, and the Court sees no basis to depart from this ruling. It is "law of the case," and thus should not be reopened unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." King v. Driscoll, 424 Mass. 1, 8 (1996) (citation and quotation omitted). Far from suggesting error in Judge Pineault's ruling, the evidence at trial showed that the Transition Agreement was a freely bargained contract between sophisticated parties, and did no more than establish a reasonable condition precedent for the receipt and retention of otherwise undue severance benefits. Thus, the Transition Agreement provides in terms that "subject to [Ms. Miele's] compliance with the provisions and covenants set forth in this Agreement and those incorporated by reference [vi z., the Restrictive Covenants Agreement] ... , [a]ny outstanding unvested rights to receive cash payments based on unvested equity-based compensation awards previouslygranted to [Ms. Miele] by the Company shall accelerate and become fully vested upon the Separation Date." Plaintiffs demonstrated violations of the non-solicit covenants to which she committed in the Restrictive Covenants Agreement and Transition Agreement represent a failure of an express condition to her receipt and retention of accelerated equity under the latter contract. The resultingloss of $952,150 in payments for such unvested equity is not an unlawful forfeiture of earned compensation.[1]
 
--------------------------------------------
 
[1] The tenns of Plaintiffs original offer letter from FMJ add nothing to the argument that Ms. Miele has been denied earned compensation related to her past services. Section 7(b) of that offer letter states explicitly that "all outstanding unvested equity-based compensation awards that have been granted acceleration rights and were granted to [Ms. Miele] under the Equity Documents prior to the Change in Control shall become exercisable and vested in
                                                            -7-
 
B. NET TRANSITION BENEFITS
            Plaintiff argues that the Transition Agreement only entitles FMI to recapture the "value" of the Transition Benefits paid to Ms. Miele, which in this case means the amount of severance Ms. Miele received net of taxes. The Court does not agree.
            At trial, the parties introduced into evidence the following written stipulation:
"Plaintiff Susan Miele and defendant Foundation Medicine, Inc. hereby stipulate that Susan Miele received the following from Foundation Medicine:
1.         From December 18, 2020 to May 7, 2021, eleven payments totaling $228,778.88.
                        2.         On December 18, 2020, one payment totaling $952,150."
            The agreed purpose of this stipulation was to establish the amount of contract damages that Plaintiff or Defendant-Counterclaimant, as applicable, would recover in the event such party prevailed on its respective claim. In this way, the jury's work would be confined to the liability questions alone. Indeed, the Court expressly instructed the jury that this was the consequence of the parties' stipulation:
"[T]he parties have stipulated to facts that do not make it necessary for you to determine damages if you find a material breach of contract. If Ms. Miele proves her claim, she will recover approximately $300,000 in damages. If Foundation Medicine proves its counterclaim, it will recover approximately $1.2 million in damages. Because the Court will address this matter depending on what you find, the damages element is not before you." (Emphasis supplied.)
 
--------------------------------------------
 
full," but only"in the event [Ms. Miele] becomes entitled to Severance Benefits within twelve (12) months following a Change in Control." Here, the evidence at trial was that Ms. Miele did not become entitled to severance benefits within 12months of Roche's 2018 acquisition of FMI, rendering any right to accelerated equity vesting per the terms of the offer letter unavailing. Rather, Plaintiffs right to accelerated vesting of her 2017 equity grants- conditioned on compliance with her restrictive covenants - arose under the Transition Agreement, which by its express terms superseded Ms. Miele's June 7, 2017 offer letter. See Transition Agreement at § 10(h) ("This Agreement, including theRestrictive Covenants Agreement, sets forth the entire agreement regarding your employment with and separation ofyour employment from the Company and supersedes any and all prior ... agreements, commitments, or writings between you and the Company including your June 7, 2017 offer letter....").
 
                                                            -8-
 
            Plaintiff registered no objection to the foregoing declaration. After trial, however, and for the first time, she argues that the damages FMI is entitled to recover should be limited to the after- tax amounts Ms. Miele actually received. In addition to the fact that Plaintiff's contention as to what Ms. Miele received in severance benefits contradicts (because it is far less than) what she specifically stipulated having received at trial, and that Plaintiff's argument conflicts with an unambiguous jury instruction to which she made no contemporaneous objection at trial, the "net of taxes"position now urged finds no support in either the Transition Agreement or common sense.
            The Transition Agreement provides in Section 2(5) that, in the event of a breach of [the Restrictive Covenants Agreement], "to the extent that any Transition Benefits have been paid, such Transition Benefits (or the value thereof) must be immediately repaid by [Ms. Miele] to the Company." The unmistakable purpose of this remedial provision is to restore FMI to the position it occupied ante breach. That is, having provided Plaintiff with Transition Benefits that were conditioned upon Ms. Miele's fulfillment of her contractual obligations under the Restrictive Covenants Agreement, FMI is entitled to have all of the money it paid to or for the benefit of Ms. Miele restored to it. The benefit of a bargain that its counterparty violated. See Doering Equip. Co. v. John Deere Co.-A Div. of Deere& Co., 61 Mass. App. Ct. 850, 855 (2004) ("[T]he long- established general rule for breach of contract recovery in Massachusetts is that the wronged party should receive the benefit of his bargain, i.e., be placed in the same position as if the
contract had been performed." [quotation omitted]).[2]
 
--------------------------------------------
 
[2] As for the contract's reference to repaying the"value" of Transition Benefits to FMI, such reference cannot rationally be construed to mean the after-tax amounts received by Ms. Miele rather than the Transition Benefits themselves. Read reasonably and in context, the reference to"value"·as an alternate form of repayment reflects an acknowledgment that, unlike cash severance, certain benefits provided to Ms. Miele (such as health insurance coverage) cannot literally be restored to FMI. In such circumstances, repayment of the "value" of the benefit, measured by its cost to FMI, is the remedy.
 
                                                            -9-
 
            Plaintiff's contention that it is somehow unfair to burden her with disgorging to FMI tax amounts that were paid to the government rather than to her directly ignores the fact that such taxes were paid in consideration of her income. The particular vehicle of remittance to the IRS, be it employer withholding or direct payment by the taxpayer at the time her Form 1040 return is filed, is immaterial. Both amounts paid by FMI were disbursed to Ms. Miele or for her benefit; and, to the extent that Plaintiff is (as here) called upon to repay such amounts, federal law makes express provision  for her recapture  of  the  related taxes paid  by  Ms. Miele.  See IRS Publication 525, available at https://www.irs.gov/pub/irs-pdf/p525.pdf(under "Claim of Right" doctrine: "If you had to repay an amount that you included in your income in an earlier year, you may be able to deduct the amount repaid from your income for the year in which you repaid it. Or, if the amount you repaid is more than $3000, you may be able to take a credit against your tax for the year in which you repaid it.").
            FMI will receive no windfall if it is paid the full amount of the damages to which Ms. Miele stipulated at trial. This party will, instead, be restored the position to which it is contractually entitled.[3] Plaintiff's argument that she should be relieved of the obligation to repay the gross amount of the Transition Benefits paid by FMI is without merit.
            C. CLAIMED EXPIRATION OF PLAINTIFF'S NON-SOLICIT OBLIGATIONS
            Plaintiff argues that her obligations not to solicit or otherwise facilitate the recruitment of FMI's employees expired in February, 2021, one year after the date when she was notified her employment with FMI would be terminating. If the Transition Agreement were so construed, then
 
--------------------------------------------
 
[3] It is generally recognized that a party ordered to repay monies received is not entitled to an offset for truces paid on the sums wrongfully obtained; for to hold otherwise would undermine the ability of the injured party to be made whole. See, Wing v. Dockstader, 482 F. App'x 361,365 (10th Cir. 2012) (holding that even good faith recipient of funds from fraudulent transfer not entitled to offset for truces paid on gains); Securities & Exch. Comm'n v. Banner Fund Int'l, 211 F.3d 602, 617 (D.C. Cir. 2000)(holding that disgorgement remedy sets liability to pay amount equal to wrongfully obtained amounts. regardless of the disposition of the original assets).
 
                                                            -10-
 
Plaintiff's proven solicitations of Richard Horlbeck, Max Walker and Jackie Pfeifer, commencing in March, 2021, fell outside the 12-month "Restricted Period" applicable to same and could not serve as the basis for a breach of the contract. The Court finds that this argument rests upon a mis- reading of the Transition Agreement.
            The gravamen of the Plaintiff's argument is that the references to the termination of Ms. Miele's employment in the Transition Agreement mean something entirely different than the references to Ms. Miele's "separation" from employment contained in that same agreement. Plaintiff thus insists that the date of her "termination" for purposes of starting the clock on her Restricted Period was the February, 2020 date when she was orally notified by Cindy Perretti that her employment at FMI was terminating, and not on the December, 2020 date when Ms. Miele actually separated from employment at the Company. Plaintiff, however, offers no textual support for this construction of the Transition Agreement, which in fact produces nonsensical results the parties could not possibly have intended.
            The Transition Agreement was structured to provide for a period of transitional employment for Ms. Miele, commencing on the effective dateof the contract (April 25, 2020) and terminating on her last day of work at FMI (December 15, 2020). More specifically, the Transition Agreement states in its first paragraph that "the purpose of this letter is to confirm the terms of your transition from your position as Chief Human Resources Officer for Foundation Medicine, Inc.... effective December 15, 2020 " Thecontract thus makes clear that Ms. Miele remained FMI's Chief Human Resources Officer through December 15, 2020, undermining Plaintiff' s current contention that she had in fact been tenninated some ten months earlier.
            Further reinforcing the conclusion that Ms. Miele was contractually ''terminated" in February, 2020, the Transition Agreement states in its third paragraph that "[r]egardless of whether
 
                                                            -11-
 
or not you enter into this Agreement, the Company will ... pay you your base salary through the lastday of your active employment." Ms.Miele acknowledged at trial that she received hersalaried compensation through December 15, 2020, her last day of active employment, once again belying the suggestion that her employment had been "terminated" prior to that date.
            Further to the above, in the Restrictive Covenants Agreement (incorporated by reference into the Transition Agreement), Plaintiff agreed that, "during [her] employment and for a period of one (I) year following the termination of [her] employment for any reason (the "Restricted Period"), [she] will not" engage in defined solicitation activities. If Ms. Miele's non-solicit obligations were intended to take effect on the date she was notified of her termination, rather than the date ten months later when she actually separated from service, there would have been no need for the parties to define the period of restriction as they did. Toe 12-month restricted period could have been started immediately as of the contract's effective date, which is the result Plaintiffs argument urges. But by stating that the restrictive covenants apply both during Ms. Miele' s employment and for a period of one year thereafter, the Transition Agreement makes clear that two distinct periods of restriction were intended: the period while Ms. Miele remained employed as FMI's Chief Human Resources Officer (through December 15, 2020), and the period running until one year from the date that Ms. Miele ceased to be Chief Human Resources Officer (through December 15, 2021). No other interpretation of the Restricted Period makes sense of the terms the parties employed, or common sense of any kind.
            Finally, the Transition Agreement provides insection 2(5) that if Ms. Miele is"terminated" by the Company for Cause prior to the Separation Date, she would forfeit any unpaid Transition Benefits.  Once  again,  this  contractual  language  cannot  be  squared  with  Plaintiff's  current contention that her employment had in fact already been terminated in February, 2020 (prior to
 
                                                            -12-
 
execution of the Transition Agreement itself).
            Viewing the overall structure and underlying intentions of the Transition Agreement as a whole. it seems clear that the parties' design was (1) to provide Plaintiff with a substantial period of transitional employment during which Ms. Miele would assist Roche in the establishment of a new human resources apparatus at FMI; (2) to compel Ms. Miele to recommit to abiding by her restrictive covenants for a period of one year following her separation from FMI; and (3) to provide Ms. Miele with accelerated equity vesting and then salary continuation for a 12-month period, contingent upon Ms. Miele' s compliance with her durationalJy co-extensive restrictive covenants. With the Transition Agreement expressly investing FMI with the right to discontinue Ms. Miele's post-termination severance benefits should she violate her restrictive covenants during this period, it simply makes no sense to have such restrictive covenants run from one date of termination and FMI's corresponding severance obligations run from another.
            Plaintiff's assertion that the restrictive covenants reaffirmed in the Transition Agreement in fact started running months prior to the execution of that contract, and expired just three months after Ms. Miele's actual separation from employment, leaving FMI with no recourse whatsoever should Ms. Miele solicit Company employees during nine of the 12 months following such separation, lacks merit. Such a convoluted construction of the Transition Agreement disserves its manifest intentions and annot be credited.[4]
 
--------------------------------------------
[4] The Court is aware that, in certain circumstances and for a very limited pwpose, an employee's tennination of employment will be deemed to have occurred when such employee received notice of his employer's decision to terminate. Such circumstances, however, concern statutes of limitation, where the pertinent inquiry asks when a plaintiff first had notice of an adverse employment action sufficient to start the running of a limitations clock against his claim. In an employment discrimination case, for example, ''termination" is deemed to have occurred when an employee has notice of the employer's decision to discharge, not when an actual separation from employment occurs. See, Adamczyk v. Augat Inc.• 52 Mass. App. Ct. 717, 722-23 (2001) (statute of limitations on discriminatory discharge claims begins to run when plaintiff notified of termination, not when actual separation from employment occurs). Such cases are very different from the case at bar, however, where "termination" starts the running of post-employment restrictive covenants. In a restrictive covenant case, it would make no sense to start the running of a restricted period while the plaintiff is still employed (and particularly where, as here, such a period
 
                                                            -13-
 
            D. COURT'S JURY INSTRUCTIONS
            Plaintiff next argues that the Court erred in instructing the jury on the meaning of Ms. Miele's non-solicitation obligations to FMI. The gist of the argument is that the Court's charge somehow misstated the terms of the operative restrictive covenants, and allowed the jury to hold Ms. Miele liable for actions toward Richard Horlbeck that did not actually violate the terms of the contract. The Court does not agree.
            Section 8 (third para.) of the Restrictive Covenants Agreement, incorporated by reference into the Transition Agreement, provides in relevant part that Ms. Miele shall not:
"(b) solicit, entice or attempt to persuade any other employee or consultant of the Company to leave the services of the Company for any reason or otherwise participate in or facilitate the hire, directly or through another entity, of any person who is employed or engaged by the Company or who was employed or engaged by the Company within two (2) months of any attempt to hire such person."
            During the trial, the undersigned advised Plaintiff's counsel that he could not argue that the fact that Mr. Horlbeck was never actually hired by Gingko foreclosed a finding that Ms. Miele violated her non-solicit covenants. This was plainly correct, as the contract's non-solicit clause, by its express terms, precluded Ms. Miele from any "attempt to persuade" Mr. Horlbeck "to leave the services of  the  Company  for  any  reason." (Emphasis  supplied.) The non-solicit covenant likewise provided that Ms. Miele must not "otherwise participate in or facilitate the hire, directly or through another entity, of any person who is employed by the Company within two (2) months of any attempt to hire such person." (Emphasis supplied.) The Court did not insert "attempted
 
--------------------------------------------
 
of post-notice/pre-separation employment lasts more than ninemonths). Indeed, to construe the Transition Agreement's restrictive covenants as Plaintiff does, running for nine months while Ms. Miele wasstill actively employed by FMI, would render most of the reach of such covenants winecessary swplusage. For a senior executive like Ms. Miele was already bound at common law by a fiduciary duty not tosolicit personnel to leave their employment at FMI. See Augat v. Aegis. Inc., 409 Mass. 165, 171-72, 173-74 (199l)(collectingcases). Once again, the language, logic and law of restrictive covenants all militate against the construction of the Transition Agreement Plaintiff urges post-trial.
 
                                                            -14-
 
hire" language into the non solicit covenant, as Plaintiff argues; for the language of attempts appears unmistakably in both prongs of the covenant. Ms. Miele thus covenanted that she would not attempt to persuade employees like Mr. Horlbeck to leave FMI; but she also covenanted that she would not "otherwise participate in or facilitate the hire, directly or through another entity, of any person" who is or was employed by FMI within two months of "any attempt to hire such person."
            Although it is clear that the second prong of the non-solicit clause references both a bar to Ms. Miele's facilitation ofa "hire" and a bar to her participation in "any attempt to hire"an FMI employee, Plaintiff s argument (to the effect that Ms. Miele could be liable for participation in or facilitation of the recruitment of Richard Horlbeck only if Mr. Horlbeck was in fact "hired" by Gingko)  reads the latter language out of the contract entirely. This offends settled canons of construction. See James B. Nutter & Co. v. Estate of Murphy, 478 Mass. 664, 669 (2018) (courts must "construe contracts as a whole, so as to give reasonable effect to each of its provisions"); First Specialty  Ins. Corp.   v.  Pilgrim  Ins. Co., 83 Mass. App. Ct. 812, 819 (2013), quoting Worcester Mut. Ins. Co. v. Marnell, 398 Mass. 240,245 (1986) ("An interpretation which gives reasonable meaning to all provisions of a contract is to be preferred to one which leaves a part useless or inexplicable"); Framingham v. Framingham Police Officers Union. 80 Mass. App. Ct. 1107, 2011 WL 4467612, at* I (Sept. 28, 2011)(Rule I:28) ("To interpret the contract [to] render [a provision] a nullity ... would depart from the court's task of construing contracts as rational business instruments(.]").
            The unmistakable purpose of the contract>s non-solicit covenant was to prohibit Ms. Miele from doing anything to bring about or attempt to bring about an employee's decision to leave FMI. The covenant's language thus extends to solicitation, enticement, persuasion, and participation in
 
                                                            -15-
 
or facilitation  of the hiring  of FMI employees,  and  in two separate places  this one-sentence provision refers to attempts. Plaintiff over-parses the language of the contract when she argues that the parties' failure to include a third reference to attempts (e.g., shall not participate in or facilitate the hire"or attempted hire'') means that Ms. Miele cannot beliable for a breach that did notproduce an actual hire of Mr. Horlbeck. This is plainly not the case.
            Courts construing contracts must doso in a manner tl;iat gives rational meaning to all of the instrument's words, Wortis v. Trustees of Tufts Coll., 493 Mass. 648, 662 (2024), and produces a result that rationally fulfills the parties' reasonably inferred intentions. Robert and Ardis Tames Found.  v.  Meyers,  474  Mass. 181,  188  (2016).  On  Plaintiff's  reading  of  the Transition Agreement, Ms. Miele's prodigious personal efforts to recruit Mr. Horlbeck to Gingko, coordinating fast-tracked interviews for him with her new colleagues, vouching for him with Gingko management, twice seeking enhancements to the offer extended to him by Gingko, and then ultimately conveying the job offer to Mr. Horlbeck herself, could not be deemed impermissible solicitation activity unless Mr. Horlbeck actually went to work at Gingko. This makes no sense, disregarding as it does all but a single over-emphasized word of the non-solicit clause's language, and the Court was right not to permit the making of such an argument to the jury.
            As for the Court's jury instructions, the undersigned is somewhat puzzled by the contention advanced in Plaintiff's motion that they misstated the terms of the parties' non-solicitation covenant. In the directly relevant portion of the charge, the Court instructed the jury as follows:
"Central to your determination of whether either of these parties has committed a violation of the Transition Agreement is the question of whether Ms. Miele breached the non-solicitation provisions of the parties' Restrictive Covenants Agreement. As you will recall, and as you will see from an examination
 
                                                            -16-
 
of the trial exhibits, the contract called upon Ms. Miele, for a period of 12 months following the termination of her employment, not to ' directly or indirectly, in any manner, ... solicit, entice or attempt to persuade any other employee or consultant of [Foundation Medicine] to leave the services of the Company for any reason[,] or otherwise participate in or facilitate the hire, directly or through another entity, or any person who is employed or engaged by the Company . . . I instruct you now that these words of the contract reflect how the parties chose to define Ms. Miele's obligations to Foundation Medicine. They are not technical terms, but are instead ordinary words to begiven their usual meaning."
The foregoing instructions to the jury are a direct and accurate quote from the parties' executed contracts, and drew no objection from Plaintiff at trial.
            It is true that, consistent with the language of Section 8 of the Restrictive Covenants Agreement, the Court elsewhere advised the jury that Ms. Miele's attempts to participate in or facilitate the hire of an FMI employee could constitute a breach of her covenants. At the same time, the Court prohibited Plaintiff from arguing that Gingko's ultimate failure to hire Richard Horlbeck foreclosed a finding of contract breach by Ms. Miele for her actions related to Mr. Horlbeck. This, too, was consistent with the terms of the Restrictive Covenants I Transition Agreement. PlaintiWs suggestion that the Court unfairly cut off all argument regarding the non- hireof Richard Horlbeck, however, is incorrect. The Court expressly invited Plaintiff to argue, and the jury to consider, the actual consequences to FMIof Ms. Miele's actions aspart of an assessment of the materiality of breach. The Court thus charged:
"Even if you determine that Susan Miele violated the Restrictive Covenants Agreement, you cannot find that such violation either forecloses Ms. Miele's right to recover on her claim or establishes Foundation Medicine's right to recover on its counterclaims unless you also find that the violation amounted to a 'material' breach.
 
                                                            -17-
 
A 'material' breach of contract occurs when a party violates an essential and inducing feature of the contract. For a breach to be material, it must be substantial and go to the root of the contract. Technical or inconsequential non-compliance with the terms of a contract will not suffice. A variance from compliance with the terms of a contract will be considered material when such failure of compliance undermined an important interest of the other party under the contract. To make the determination of whether or not a party's breach of contract was material. you are to consider all of the relevant facts and circumstances. including the particular obligations of the contract alleged to have been violated, the degree of importance the parties attached to the fulfillment of those obligations, the nature and extent of the breaching behavior, and the consequences that the non-breaching party experienced." (Emphasis supplied.)
Plaintiff was thus plainly permitted to (and did) argue that the non-hire of Richard Horlbeck by Gingko, and the fact that Mr. Horlbeck was already intending to leave FMI before Ms. Miele engaged with him about joining her new employer, rendered any breach of the Restrictive Covenants Agreement (insofar as concerns him) immaterial.
            All told, the Court discerns no error of law in its jury instructions warranting a new trial. The jury heard abundant evidence (from both Ms. Miele and Mr. Horlbeck themselves) to the effect that Plaintiff undertook many actions - some direct and some behind the scenes through others - in an effort to cause Mr. Horlbeck to leave FMI and join her at Gingko. Such efforts clearly violated the non-solicit covenants to which Ms. Miele was bound, and Plaintiff's arguments to the contrary lack merit.
            E. SOLICITATION OF JACKIE PFEIFER
            Finally, Plaintiff's motion argues that it was error to admit evidence regarding Ms. Miele's solicitation of Jackie Pfeifer, and that the jury should not have been permitted to consider such evidence in its evaluation of whether Plaintiff committed a material breach of the Restrictive Covenants I Transition Agreement. Plaintiff's argument rests upon two propositions. First,
 
                                                            -18-
 
Plaintiff maintains that the trial evidence of Ms. Miele's dealings with Jackie Pfeifer was insufficient as a matter of law to permit a reasonable inference that such dealings amounted to a material breach of the contract. Second, Plaintiff argues that because FMI made its determination that Ms. Miele had materially violated the contract in May, 2021, any .subsequently acquire evidence that Ms. Miele recruited Jackie Pfeifer to leave FMI in September, 2021 cannot properly be considered a part of such breach. The Court rejects both contentions.
            Regarding  Plaintiffs argument that the evidence permitted  no reasonable  inference that Ms. Miele recruited Jacki Pfeif.er to Gingko in violation of her non-solicit obligations, this is demonstrably not the case. Evidence at trial, construed in the light most favorable to FMI as Rule 50(b) requires, see O'Brien. 449 Mass. at 382-83, showed that Ms. Miele began communicating with Ms. Pfeifer about a possible job at Gingko in May of 2021. Ms. Pfeifer thus forwarded her resume directly to Ms. Miele at the latter's personal email address at Gingko, and invited her to comment "[if] this does the job" and "if [she] needed anything else from me." The fact that Ms. Miele was also shown to have been actively courting Messrs. Horlbeck and Walker, erstwhile FMI colleagues, to make the move to Gingko just weeks prior to these communications, together with the fact that Ms. Pfeifer accepted a position at Gingko months later (and with a "dotted line" reporting relationship to Ms. Miele herself), permits a more than reasonable inference that Plaintiff recruited Ms. Pfeifer to leave FMI in violation of her restrictive covenants.[5]
            As for Plaintiffs contention that FMI cannot rely on evidence of contract breach by Ms. Miele that it did not discover until after giving notice of her non-solicit violations, that is simply
 
--------------------------------------------
 
[5] Under the circumstances, the dearth of written communications between Plaintiff and Ms. Pfeifer after May, 2021 (the point at which FMI gave formal notice of Ms. Miele's contract violations and ceased paying her severance compensation) proves nothing more than that Ms. Miele thereupon became more careful about leaving breadcrumbs of breach for FMI to find. The jury was certainly warranted in drawing the inference, particularly given Ms. Pfeifer's September, 2021 hire by Gingko, that Plaintiff's solicitations of this former colleague continued unabated.
 
                                                            -19-
 
not the law. "[T]he after-acquired evidence doctrine, when applied in Massachusetts courts, is generally employed to justify wrongful terminations through evidence that the employee engaged in conduct that, although not known by the employer before termination, would have led to termination if known." Prozinski v. Northeast Real Est. Servs. LLC, 59 Mass. App. Ct. 599, 61I (2003), quoting Markovits v. Venture Info Capital, Inc., 129 F. Supp.2d 647, 653 (S.D.N.Y.2001). Our courts, following the United States Supreme Court's decision in McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 358-59 (1995), have held that an employer may not rely on such after-acquired evidence to defeat a claim of discriminatory termination, "because the antidiscrimination statutes have a prophylactic purpose beyond the particular employee concerned." Boston v. Massachusetts Comm'n Against Discrimination, 39 Mass. App. Ct. 234, 241-42 (1995) (evidence acquired after defendant employer made challenged decision could not be relied upon as legitimate non-discriminatory reason for decision itself). The applicability of the after-acquired doctrine to claims other than those asserting employment discrimination, however, is more ambiguous. Compare EventMonitor, Inc. v. Leness, 473 Mass. 540, 543 (2016) ("(I]n the rare opportunities that [the SJC] and the Appeals Court have had to consider the issue of after-acquired evidence in the context of a termination from employment [outside of discrimination], neither of the courts has adopted, or declined to adopt, this doctrine.") with Strobeck v. Muggia, 89 Mass. App. Ct. 1102, 2016 WL 320215, at *2-3 (Jan. 27, 2016) (Rule 1:28) (applying Delaware law and holding that, where contract permitted termination for "cause," the "jury were permitted to consider if cause existed for [employee's] termination regardless of when the evidence was discovered."). Importantly, while the case at the bar arises from an employment relationship, it does not involve a claim of wrongful termination (much less employment discrimination). There is no "after-acquired
 
                                                            -20-
 
evidence" doctrine that applies in common law contract cases like this one, because the legal question presented is whether there was or was not a breach entitling FMI to terminate Ms. Miele's severance compensation. Unlike an employment discriminationor wrongful tennination case, by contrast, where liability necessruilv turns on the employer's motivation for decision, what FMI knew about Ms. Miele's breaches and when it knew of them are immaterial.
            The Appeals Court's decision in Prozinski, 59 Mass. App. Ct. 599, is squarely on point. There, the defendant argued that Prozinski's misconduct constituted a material breach of the parties' employment agreement, thereby relieving the employer of any obligation to pay severance. The Appeals Court held that the employer was entitled to rely on all evidence of the defendant's misconduct as proof of breach, regardless of whether the employer discovered such evidence before or after it decided not to pay Prozinski severance. The Court explained, with regard to the plaintiffs "after-acquired evidence" challenge to the ass.erted grounds for severance denial, as follows:
"In the circumstances of this case, where the only damages at issue regard severance pay and there is no live claim of wrongful termination or of breach of an employment contract provision regarding grounds for termination, it does not appear to us to be necessary to rely on the after- acquired evidence doctrine for Northeast to introduce admissible evidence gathered in the course of its investigation or discovery on the question of material breach. We are aware ofno authority that would limit Northeast at trial to the facts or legal theory set forth in its termination letter."
Id. at 612.
            Here, FMI argues that it was relieved of the obligation to pay Plaintiff severance and entitled to a clawback of prior payments because Plaintiff materially breached the terms of the Restrictive Covenants/ Transition Agreement. Plaintiff has not cited any authority limiting FMI's
 
                                                            -21-
 
ability to introduce evidence of Plaintiff's breaches to facts that were known to FMI at the time it terminated such payments.
 CONCLUSION AND ORDER
            For all the  foregoing reason=s the Court concludes that Plaintiff received a fair trial. The jury's verdict was amply supported by the preponderant evidence, and there were no material errors oflaw. Plaintiff's Motions for Judgment Notwithstanding the Verdict or for a New Trial are, therefore, DENIED.
SO ORDERED.
/s/Robert B. Gordon
Justice of the Superior Court
Dated:
March 30, 2026